[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 3, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-14763

_____

D. C. Docket No. 02-00586-CR-18-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CESAR GARCIA,
HECTOR NUNEZ,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May  3, 2006)

Before CARNES, WILSON and PRYOR, Circuit Judges.

PRYOR, Circuit Judge:

This appeal by Cesar Garcia and Hector Nunez presents two main issues. The first issue is whether, under the Sixth Amendment as interpreted in Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004), the district court erred by permitting an expert witness to explain that he had relied upon the out-of-court statement of a drug trafficker who testified at trial to the same statement. The second issue is whether, under Federal Rule of Evidence 703, the district court abused its discretion by permitting the expert witness, an experienced law enforcement officer, to explain that, in determining the meaning of coded language, he had relied upon the out-of-court statement of the drug trafficker. We conclude that the Sixth Amendment does not prohibit the admission of an out-of-court statement when the declarant testifies at trial to the same statement, and the district court did not abuse its discretion in admitting the testimony of the expert witness whose expertise included debriefing drug traffickers about their use of coded language. We also conclude that sufficient evidence supported Garcia's and Nunez's convictions for knowingly participating in a drug trafficking conspiracy, sufficient evidence supported Garcia's conviction for possession of a firearm in furtherance of a drug trafficking crime, and the district court was not required to hold a second hearing to determine whether Garcia's lawyer should have been disqualified due to a conflict of interest. We affirm.

## I. BACKGROUND

Our decision in a related appeal, <u>United States v. Molina</u>, ___ F.3d ___, No. 04-13114 (11th Cir. Mar. 24, 2006), addressed several facts that also are relevant to this appeal. On September 19, 2002, in the course of investigating a major drug trafficking organization, agents of the Drug Enforcement Agency executed a search warrant for the residence at 1131 Vermillion Lane near Atlanta in Georgia. The agents found Garcia and his common-law wife, Eliany Molina, in an upstairs bedroom. That bedroom, with the adjoining bathroom, contained substantial evidence of a drug trafficking conspiracy. The evidence in the bedroom included a bag containing 14.3 grams of cocaine on the floor, a digital scale on top of a dresser, and a handgun in the open drawer of a nightstand next to the bed. The evidence in the adjoining bathroom included a laundry hamper with a bag containing 25.1 grams of cocaine and another digital scale, covered by clothes. The agents also found evidence in the bedroom closets: one closet contained a large blue garbage bag of bundled U.S. currency; the other closet contained a shoe box of bundled U.S. currency. The garbage bag contained the bulk of the nearly $300,000 that the agents seized from Garcia's residence.

The agents arrested Garcia, Molina, and Carlos Garza. Molina is the sister-in-law of Garza. She also is the sister-in-law of Sebastian Cuevas, the purported

ringleader of the drug trafficking organization.

The next day, September 20, DEA agents arrested Hector Nunez at a residence in Atlanta. The agents seized Nunez's cell phone. Nunez stated he was from Houston and admitted that Cuevas was his cousin. Nunez explained that he traveled from Houston to Atlanta buying and selling cars, and Nunez denied that he was involved in drug trafficking.

A month before Nunez was arrested, the government had used a wiretap to record three conversations between Cuevas and a speaker at the cell phone that the agents would later seize from Nunez when they arrested him. Transcripts of two of these three conversations contain coded references to drug trafficking. In the conversation recorded on August 18, the speaker at Nunez's phone asks Cuevas, "What have you heard about [STUTTERS] 'Ruthie'?" Cuevas responds, "Uh, that she was there at . . . she is still down there in McAllen." The unidentified male responds, "Look uhm, I spoke to the lady . . . about the number I gave you yesterday. . . . And she was telling me that if you want, uh, she can send it over . . . tomorrow at dawn." The unidentified male later says, "the truck driver is going to call her back in a little while, to see if she has anything." A few lines later, Cuevas tells the unidentified male, "Your shirts will be ready for tomorrow afternoon." In the conversation recorded three days later, on August 21, the speaker at Nunez's

phone says, "I'm running around, trying to find the guy of the [STUTTERS] shirts. . . . Uhm, I'm looking for him so that I don't have the . . . the shirts here with me, you understand?"

The government also recorded, on August 20 and 22, 2002, two other calls to or from Cuevas in which the second number was not identified. In the conversation recorded on August 20, Cuevas asks the unidentified female who answers the phone, "Yes, hello. Excuse me, is that guy, Hector, there?" The unidentified female says, "Uh . . . he's asleep because he just arrived from Houston." Cuevas says, "Oh! Yes, yes, yes." The unidentified female then notifies the male referred to as Hector, who takes the phone and says, "Hello?" Cuevas says, "What's up, cuz . . . ? Did I wake you up?" Hector replies, "Cuz . . . how are you?" Cuevas asks, "At what time did you arrive?" Hector replies, "Just a little while ago. . . . I brought Ruthie from over there." Cuevas asks, "You already brought it []? . . . Well . . . it was about time, right?" Hector says, "Yeah man [unintelligible] he didn't . . . He didn't want to come over here, up here." After several lines of conversation, Hector says, "Yes, uhm, I went to . . . pick him up there in uhm . . . in San Antonio." A few lines later Cuevas asks, "And did he come with, and did he come with the lady that you were talking about?" Hector replies, "No, the . . . he came with the same . . . the same ones from, from . . .

5

others, man. Some others that . . . ." Cuevas asks, "Other people?" Hector says, "Yes, they were able to get them." Cuevas asks, "But did they, did they bring it over alright, finally?" Hector says, "Yes. Uh, it did get there alright. . . . It took them an hour and a half to put it inside. . . . It's just that I had to go pick them up really far away, and I just got in now. I was up all night." Cuevas says, "Yes, I can imagine."

The conversation recorded on August 22 is between Cuevas and an unidentified man. Neither speaker uses the word "Hector" and Nunez's phone was not linked to this call. In this conversation, the unidentified man tells Cuevas, "I'm still . . . holding some for you," and later says, "I'd like to go bring those shirts over here for you once and for all, so I can have them here, but I say, 'Well what, what are they going to be doing just hanging here?'" The unidentified man also describes how "a cousin called me . . . He needed one [] shirt, but that . . . he wants two [] days . . . . he said that he's . . . [unintelligible] jump today, you know what I mean?" The unidentified man later says, "I don't want to . . . grab the shirts and then, they end up wearing them and then they say no. . . . I'd be letting you down even more, and that's what I don't want."

On December 16, 2003, a grand jury returned an amended indictment that charged 14 defendants with a variety of drug-related crimes. The indictment

charged Garcia and Nunez with conspiracy to possess with the intent to distribute, and to distribute, at least 5 kilograms of cocaine and at least 500 grams of methamphetamine. See 21 U.S.C. §§ 846, 841(b)(1)(A)(ii), (viii). The indictment also charged Garcia with possession of cocaine with the intent to distribute, see id. § 841(a)(1), and possession of a firearm in furtherance of a drug trafficking crime, see 18 U.S.C. § 924(c)(1)(A)(i).

An attorney, Derek Wright, sought to represent Garcia, Molina, and Garza. The government filed a pretrial motion to disqualify Wright because his representation of multiple defendants created the potential for a conflict of interest. Garcia and Molina filed a brief opposing the disqualification of Wright.

In their brief, Garcia and Molina stated that "Wright met with each Defendant and explained the subject matter of conflict of interests, both actual and potential, with all three Defendants." According to Garcia and Molina, "All three Defendants indicated that there was no conflict of interest or position that was antagonistic to the other in either a trial issue or plea negotiation issue." Garcia and Molina reported that "all three Defendants executed waiver of conflict of interest and an election to have Derek M. Wright represent all three." Garcia and Molina also stated that Wright would withdraw from representation of Garza. Garcia and Molina stated that "Garcia strongly desires that Derek M. Wright

7

represent him and his wife."

Garcia and Molina filed with the court signed waivers of conflicts of interest. Garcia and Molina each stated in individual waivers that they did not believe that there were "any conflicts of interest which would cast doubt upon or interfere in any way with Derek M. Wright fully representing my legal interests." Garcia and Molina also each stated, "In the event that a conflict of interest, an appearance of a conflict of interest, or the possibility of a conflict of interest should arise, I hereby waive any objection to Derek M. Wright representing me in the above referenced matter."

On December 10, 2003, a magistrate judge held a hearing on the matter of Wright's dual representation. The magistrate judge asked Garcia, "[W]ho do you want to be your attorney?" Garcia replied, "Derek Wright." The magistrate judge asked Molina if she wanted to be represented by Mr. Wright. Molina answered, "Yes." The magistrate judge then stated, "There is, at the very least, a potential conflict of interest . . . and I'm gonna try to explain some of that in a way that the defendants can understand." The magistrate judge invited the defendants to notify her "if at any time you want to speak with me privately, that is without anyone else present." The magistrate judge confirmed that Garcia was fluent in English, Molina understood the court proceedings through an interpreter, and neither Garcia

8

nor Molina had used drugs or alcohol or taken medicine or pills in the past 24 hours.

The magistrate judge explained how a conflict of interest could arise in plea bargaining, the exercise of peremptory challenges to jurors, direct examination at trial, and sentencing. The magistrate judge told Garcia and Molina "that money or your ability to hire an attorney should not enter into your decision as to whether you both want to proceed with the same attorney. You are entitled to a very qualified attorney even if you cannot afford an attorney." The magistrate judge asked Garcia and Molina individually whether they wanted to speak to an independent counsel, at no cost, "about the wisdom of going forward with the same attorney." Each defendant answered "no." The magistrate judge asked Garcia and Molina individually whether, "knowing everything that I've said, do you want to continue with Mr. Wright as your attorney?" Each defendant answered "yes." In an order the next day, the magistrate judge denied the government's motion to disqualify Wright from representing both Garcia and Molina.

The government made its cases against Garcia and Nunez in one trial. The case against Garcia consisted primarily of the testimony of the agents who had searched his residence, the evidence seized in that search, and expert testimony about drug trafficking organizations. As the testifying officers explained and

9

several exhibits illustrated, the evidence seized in the search of Garcia's bedroom and adjoining bathroom included two bags of cocaine, a digital scale, a digital scale with cocaine residue, a firearm in the open drawer of a nightstand, a shoe box of bundled U.S. currency, and a large blue garbage bag with the bulk of the nearly $300,000 found in the house. In addition to the physical evidence and fact witnesses, the government also proffered DEA Special Agent Keith Cromer as an expert witness in the organization and structure of Mexican drug trafficking organizations, including the use of coded language and the manufacture, distribution, and packaging of narcotics.

The government tendered Cromer as an expert witness on the basis of several factors. Cromer had been a DEA agent since 1999. Cromer had attended a 16-week training course at the DEA academy that included executive techniques, legal aspects of drug offenses, interviewing and interrogations, drug identification, the operation and structure of drug trafficking organizations, and how those organizations transport and distribute drugs. Cromer had been involved in at least 50 drug investigations. Eighty-five to ninety percent of those investigations had involved Mexican drug organizations and, in 12 of those cases, Cromer had been the "case agent." Cromer also had participated in numerous wiretap investigations. Cromer explained that, on the basis of his training and experience, he was familiar

10

with the organization and structure of Mexican drug trafficking organizations. He also explained that he was familiar with the coded language that some drug trafficking organizations use and how drug trafficking organizations manufacture, package, and distribute methamphetamine and cocaine. The district court permitted Cromer to testify as an expert witness.

Cromer testified about how drug trafficking organizations are divided into functional components that include, among others, transportation, distribution, collection of drug proceeds, and money laundering. Cromer testified that drug trafficking organizations often use separate "stash houses" to store drugs and drug proceeds. Cromer explained that drug traffickers typically stash drug proceeds in houses occupied by residents the drug traffickers trust, like longtime friends or family members. Cromer testified that drug traffickers use scales to weigh and package drugs for distribution. Cromer also testified that drug traffickers often possess weapons "for protection from other drug traffickers and from law enforcement. They . . . may have them at the residence where they are going to store the drugs or they store the money."

Cromer also testified about how drug traffickers use coded language to refer to drugs. Cromer testified that "the majority of time different drug traffickers use the same coded language that you would hear in one investigation to another

11

investigation." Cromer explained the meaning of several code words. Cromer testified that the term "shirts" is used as a substitute for the word "cocaine," and sometimes for "methamphetamine" too. Cromer testified that the word "lady" refers to "cocaine" and he believed the word "Ruthie" means drugs. Cromer also explained that "McAllen" is a city in Texas "from where the drugs are smuggled from Mexico into the United States" and the word "trailer" refers to "a tractor trailer[,] which is one of the common forms of how to transport drugs from McAllen, Texas, to Atlanta." The jury heard each of the recorded conversations in which the government alleged that Nunez used coded language to discuss drug trafficking with Cuevas.

Cromer explained that cooperating informants often help investigators establish the meaning of coded language. Cromer explained that, to determine the meaning of coded language, investigators rely upon interviews with arrested suspects and information gathered by surveillance and corroborated by seizures. On redirect examination, Cromer testified that, in this case, a cooperating defendant named Antonio Mojica, who had worked for Sebastian Cuevas and talked with him by phone, had told Cromer that the word "t-shirts" meant "cocaine." When Garcia's attorney objected to Cromer testifying about what Mojica had told him, the government stated that, because the defendants had

12

challenged the basis of Cromer's expert opinion, Cromer could explain the sources he had used to form his opinion. The district court noted its discretion under Federal Rule of Evidence 703 and admitted the testimony.

Mojica also testified at trial. Mojica admitted he had used code words to describe drugs. Mojica testified that he and Cuevas had used the word "shirts" in talking about drugs, and "an ounce of cocaine is one shirt."

After the government presented its case, Garcia and Nunez each moved for a judgment of acquittal. The district court reserved its ruling on the motions.

Nunez did not present evidence, but Garcia decided to testify. Garcia testified that the drugs in his bedroom came from a man called Marcos, the same man who had asked Garcia to store the garbage bag of money that the agents found in Garcia's closet. Garcia testified that he was addicted to cocaine, and he planned to use the cocaine found in his bedroom with his friends. Garcia testified that the drugs belonged to him, not Molina, and Molina did not know about the drugs or the money in the garbage bag. Garcia admitted suspicions that Marcos was a drug dealer and the garbage bag contained drug proceeds. Garcia admitted he was concerned someone might try to steal the money Marcos gave him, but denied he would have used the firearm to protect it. Garcia also recounted how initially he had told the arresting agents he had no firearm, but then directed them to the

13

firearm in the open drawer of the nightstand. Garcia admitted that he had lied "a little bit" when the DEA agents questioned him upon arrest.

On January 28, 2004, a jury found Garcia and Nunez guilty of the charged offenses. Garcia and Nunez each moved for judgments of acquittal. The district court denied their motions, and Garcia and Nunez appealed.

## II. STANDARD OF REVIEW

We apply three standards of review to Garcia's and Nunez's challenges. First, when a district court is asked to decide whether the presumption in favor of a defendant's counsel of choice is overcome by actual conflict or serious potential for conflict, the Supreme Court has instructed that the district court has "broad latitude . . . in making this decision" and "[t]he evaluation of the facts and circumstances of each case . . . must be left primarily to the informed judgment of the trial court." Wheat v. United States, 486 U.S. 153, 163, 164, 108 S. Ct. 1692, 1699, 1700 (1988). Second, we review evidentiary rulings, including whether to admit expert testimony, for abuse of discretion. See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1339-40 (11th Cir. 2003); United States v. Range, 94 F.3d 614, 620 (11th Cir. 1996). Third, we review de novo whether evidence is sufficient to sustain a conviction. See, e.g., United States v. Williams, 144 F.3d 1397, 1401-02 (11th Cir. 1998). "In considering a motion for the entry of

14

a judgment of acquittal, a district court 'must view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005) (quoting United States v. Sellers, 871 F.2d 1019, 1021 (11th Cir. 1989)). "It is not necessary for the evidence to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt . . . ." United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc); see Sellers, 871 F.2d at 1021. "The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury." Sellers, 871 F.2d at 1021 (internal quotations and citations omitted).

## III. DISCUSSION

Our discussion is divided into four parts. We first discuss the admission of Special Agent Cromer's expert testimony, which also raises the two main issues in this appeal:  whether the district court erred under the Sixth Amendment or abused its discretion when it admitted Cromer's testimony about the out-of-court statement of a drug trafficker. We then address whether the district court abused its discretion by not holding a second hearing on whether to disqualify Garcia's

15

counsel due to a conflict of interest. We next address whether sufficient evidence supported the convictions for conspiracy. We end with a discussion of whether sufficient evidence supported Garcia's conviction for possession of a firearm in furtherance of a drug trafficking crime.

### A. *The District Court Properly Admitted Cromer's Expert Testimony.*

Garcia and Nunez raise three issues with Special Agent Cromer's expert testimony. First, Garcia argues that the district court abused its discretion under Federal Rules of Evidence 702 and 403 by permitting Special Agent Cromer to testify as an expert witness. Second, Garcia and Nunez argue that the district court erred under the Sixth Amendment by permitting Cromer to testify about the hearsay statement of a cooperating conspirator. Third, Nunez argues that the district court abused its discretion under Federal Rule of Evidence 703 when it permitted Cromer to testify about the hearsay statement of a cooperating conspirator. Each argument fails.

#### 1. The District Court Did Not Abuse Its Discretion by Permitting Cromer to Testify as an Expert Witness.

Federal Rule of Evidence 702 permits expert testimony if "specialized knowledge" will help the jury "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "[A] witness [may be] qualified as an expert by knowledge, skill, experience, training, or education." Id. "The operations of

16

narcotics dealers are a proper subject for expert testimony under Rule 702," United States v. Ginsberg, 758 F.2d 823, 830 (2d Cir. 1985), and we have recognized the "well-established" "rule" that "an experienced narcotics agent" may testify as an expert to help a jury understand "the significance of certain conduct or methods of operation unique to the drug distribution business." United States v. Butler, 102 F.3d 1191, 1199 (11th Cir. 1997) (internal quotations omitted). We also have "affirmed the admission under Rule 702 of the expert testimony of a police officer interpreting 'drug codes and jargon.'" United States v. Novaton, 271 F.3d 968, 1008 (11th Cir. 2001) (quoting United States v. Brown, 872 F.2d 385, 392 (11th Cir. 1989)).

The district court did not abuse its discretion by permitting Special Agent Cromer to testify as an expert witness. Cromer had been a DEA agent for several years and had received training regarding the operation and structure of drug trafficking organizations and how those organizations transport and distribute drugs. Cromer had been involved in at least 50 drug investigations and the majority of those involved Mexican drug trafficking organizations. Cromer also had participated in numerous wiretap investigations and was familiar with the coded language that some drug trafficking organizations use. Cromer clearly was an "experienced narcotics agent," and his testimony could have helped the jury

17

understand the evidence.  See id.; Fed. R. Evid. 702.

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  Fed R. Evid. 403.  Special Agent Cromer's testimony was highly probative.  Cromer's testimony about drug traffickers' use of code words, for example, was probative because "drug dealers often camouflage their discussions . . . [and] expert testimony explaining the meanings of code words may 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  United States v. Dukagjini, 326 F.3d 45, 52 (2d Cir. 2003) (quoting Fed. R. Evid. 702).  Cromer's testimony about how drug trafficking organizations compartmentalize certain operations and roles was highly probative because, as the government argues, "this is precisely the type of testimony . . . [that could] help the jury understand how the conduct and evidence relating to the individual participants might further the goals and purposes of the drug trafficking organization."  The district court did not abuse its discretion in concluding that any unfair prejudice Cromer's testimony could have caused did not outweigh its high probative value.

2. The District Court Did Not Err Under the Sixth Amendment by Admitting Cromer's Testimony About the Out-of-Court Statement of a Drug Trafficker Who Testified at Trial to the Same Statement.

Garcia and Nunez contend that, because Cromer explained that his opinion

18

about the meaning of "shirts" was based on a statement made by Mojica, a cooperating conspirator, part of Cromer's testimony was hearsay admitted in violation of the Sixth Amendment, as interpreted in Crawford. 541 U.S. 36, 124 S. Ct. 1354. This argument fails because the Sixth Amendment, as interpreted in Crawford, bars the admission of the out-of-court statements of declarants who do not testify at trial: "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial." Id. at 53-54, 124 S. Ct. at 1365 (emphasis added). Unlike the declarant in Crawford, id. at 40, 124 S. Ct. at 1357, Mojica testified at trial and he testified to the same statement Cromer had described. Garcia and Nunez had ample opportunity to confront and cross-examine Mojica, and Cromer's testimony about Mojica's statement was offered to explain the basis of Cromer's opinion as an expert.

3. The District Court Did Not Abuse Its Discretion Under Rule 703 by Admitting Cromer's Testimony About Mojica's Statement.

Nunez objects that Cromer's testimony was inadmissible hearsay, but a district court enjoys the discretion to permit an expert witness to "disclose[] to the jury" "[f]acts or data that are otherwise inadmissible" if "the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703. It is understandable that the district court might have wanted the jury to understand that

19

Cromer had relied on the statements of Mojica: any problems with the credibility of Mojica, whom the jury saw and heard testify, might have affected the decision of the jury to credit or reject Cromer's testimony.

Nunez correctly reminds us that Rule 703 applies only when an expert witness testifies about matters within the scope of his expertise. See Dukagjini, 326 F.3d at 58. We certainly agree that hearsay evidence admitted under Rule 703 "must be the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject," United States v. Scrima, 819 F.2d 996, 1002 (11th Cir. 1987), but there is no abuse of discretion in concluding that the debriefing of suspected drug traffickers is "the type of evidence" that is "reasonably relied upon" by seasoned drug enforcement officers "in forming opinions or inferences" about the use of coded language by drug traffickers. This Court has recognized that a law enforcement officer testifying as an expert witness may rely on information he received from other people if "such sources of information were regularly relied upon" "by experts in his field." United States v. Brown, 299 F.3d 1252, 1257, 1258 (11th Cir. 2002), vacated, 538 U.S. 1010, 123 S. Ct. 1928 (2003), remanded to and reinstated by 342 F.3d 1245 (11th Cir. 2003), cert. denied, 543 U.S. 823, 125 S. Ct. 37 (2004). We have stated, for example, that "Rule 703 encompasses hearsay statements in a context . . .

where the government expert specifically testified that his opinion was based on his experience and expertise, in conjunction with the information he received from a DEA intelligence agent and Bermudan authorities, and that such sources of information were regularly relied upon in valuating narcotics." Id. at 1257. We also have explained that "expert testimony by an ATF agent based partly on his own analysis, but verified by consultation with an ATF technical specialist, was properly admitted under Rule 703 where the agent testified that the consultation was of the kind regularly relied upon by experts in his field." Id. at 1257-58 (characterizing the holding in United States v. Floyd, 281 F.3d 1346, 1349-50 (11th Cir. 2002)).

Nunez's reliance on Dukagjini is misplaced. That court concluded that the expert testimony "at times departed from the bounds of Rules 702 and 703 and from reliable methodology" and the witness had "repeatedly deviated from his expertise on drug jargon." Id. at 58-59. Unlike Cromer, the expert in Dukagjini "was relying on his conversations with non-testifying witnesses and co-defendants in order to prove 'the truth of the matter asserted'" rather than "translating drug jargon, applying expert methodology, or relying on his general experience in law enforcement." Id. at 59. The court recognized that "an expert [is permitted] to rely on hearsay evidence for the purposes of rendering an opinion based on his

21

expertise," id., but excluded the testimony in that case because "the expert was repeating hearsay evidence without applying any expertise whatsoever," id.

In contrast with Dukagjini, the district court did not abuse its discretion in concluding that Cromer had applied his expertise in relying on, among other sources, his interview with Mojica to determine the meaning of coded language. An experienced agent like Cromer, by virtue "of his professional knowledge and ability, [was] competent to judge for himself the reliability of" statements made by an admitted drug trafficker in post-arrest debriefings in forming an expert opinion about the drug traffickers' use of coded language. United States v. Williams, 447 F.2d 1285, 1290 (5th Cir. 1971). The district court did not abuse its discretion in admitting that testimony.

## B. The District Court Did Not Abuse Its Discretion by Not Holding a Second Hearing on Whether to Disqualify Garcia's Attorney.

Garcia argues that the district court abused its discretion by not conducting a second hearing on whether to disqualify Garcia's attorney due to a conflict of interest. Garcia does not argue that he received ineffective assistance of counsel. Garcia argues that the district court should have intervened at trial when he testified adversely to himself and favorably to Molina, although the district court already had held a full hearing and Garcia had waived any actual, apparent, or possible conflict. Garcia's argument fails.

22

An attorney "may" be disqualified when an actual or even a potential conflict of interest exists, United States v. Ross, 33 F.3d 1507, 1523 (11th Cir. 1994), but the defendant "may waive this conflict of interest and elect to have the attorney continue representation, so long as that waiver is knowing, intelligent, and voluntary," id. at 1524; see McConico v. Alabama, 919 F.2d 1543, 1548 (11th Cir. 1990). "In order for a waiver of the right to conflict-free counsel to be knowing and intelligent, the State must show that the defendant (1) was aware that a conflict of interest existed; (2) realized the consequences to his defense that continuing with counsel under the onus of a conflict could have; and (3) was aware of his right to obtain other counsel." Zuck v. Alabama, 588 F.2d 436, 440 (5th Cir. 1979). Although the district court is not required to accept a defendant's waiver, Wheat, 486 U.S. at 164, 108 S. Ct. at 1700, "a criminal defendant has a presumptive right to counsel of choice and courts should hesitate to disqualify defense counsel," Ross, 33 F.3d at 1522-23 (citing Wheat, 486 U.S. at 164, 108 S. Ct. at 1700).

Garcia knowingly, intelligently, and voluntarily waived objection to his attorney's conflict of interest. The magistrate judge held an extensive pretrial hearing and confirmed that Garcia spoke English and was not under the influence of drugs, alcohol, or medication. The magistrate judge explained how a conflict of interest could arise in plea bargaining, exercising peremptory challenges to jurors,

23

direct examination, and sentencing. The magistrate judge told Garcia the government would pay for a lawyer to represent him. The magistrate judge told Garcia the government even would pay for a lawyer to discuss with Garcia the wisdom of proceeding without independent counsel. Garcia knew there was at least a possible conflict, he knew how this conflict could harm his interests, and he knew he had the right to an attorney at no cost to himself. Because Garcia effectively waived any conflict following a thorough pretrial hearing, the district court was not required to inquire at trial about Wright's conflict of interest.

### C. *Sufficient Evidence Supported Both Convictions for Conspiracy.*

Garcia and Nunez argue that the district court erroneously concluded that sufficient evidence supported their convictions for conspiracy. "To convict a defendant for conspiracy . . . , the evidence must show (1) that a conspiracy existed, (2) that the defendant knew of it, and (3) that the defendant, with knowledge, voluntarily joined it." United States v. Perez-Tosta, 36 F.3d 1552, 1557 (11th Cir. 1994). "The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." United States v. Ayala, 643 F.2d 244, 248 (5th Cir. Unit A 1981); see United States v. Spradlen, 662 F.2d 724, 727 (11th Cir. 1981). "A conspiracy conviction will be upheld . . . when the

24

circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." United States v. Figueroa, 720 F.2d 1239, 1246 (11th Cir. 1983). We apply these standards to each verdict of guilt and conclude the evidence was sufficient.

1. Sufficient Evidence Supported Garcia's Conviction for Conspiracy.

Garcia argues that his "mere presence" at the scene of a crime is insufficient to convict him for conspiracy, but Garcia was not "merely" present in a house full of drugs, drug money, drug traffickers, and at least one firearm. Most of the physical evidence against Garcia was found in either his bedroom or bathroom, Garcia admitted the drugs were his, and one of the digital scales had cocaine residue. Garcia testified the drugs were merely for his personal use, but the jury reasonably could have concluded that the drugs were for distribution because "a defendant [who] chooses to testify . . . runs the risk that if disbelieved 'the jury might conclude the opposite of his testimony is true.'" United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) (quoting Atkins v. Singletary, 965 F.2d 952, 961 n.7 (11th Cir. 1992)). Garcia lived with two conspirators and was related through his common-law marriage to Cuevas, the ringleader of the conspiracy. It would have been reasonable to conclude that Garcia's drug activity was related to the charged conspiracy.

25

The DEA agents also found nearly $300,000 in Garcia's house, most of it in his bedroom closet. "A person who owns or exercises dominion and control over a . . . residence in which contraband is concealed may be deemed to be in constructive possession of the contraband," United States v. Vera, 701 F.2d 1349, 1357 (11th Cir. 1983), and "a defendant involved only in the money laundering facet of the drug business could be considered a part of the conspiracy to distribute those drugs," United States v. High, 117 F.3d 464, 469 (11th Cir. 1997). The large sum of money in Garcia's room provided yet another basis for conviction. Sufficient evidence supported Garcia's conviction for conspiracy.

2. Sufficient Evidence Supported Nunez's Conviction for Conspiracy.

Nunez argues the government failed to prove that he was the person recorded on the phone calls, the phone calls involved illegal activity, the phone calls referred to cocaine, or the phone calls were part of the conspiracy alleged in the indictment. Each argument fails.

First, a jury reasonably could have concluded that Nunez was the speaker in the five phone calls. Self-identification and telephone subscriber information are recognized means to establish the identity of persons speaking in recorded conversations. See United States v. Green, 40 F.3d 1167, 1173 (11th Cir. 1994). Three of the calls were to or from Nunez's cell phone. In the fourth call, Cuevas

26

asked for "Hector" and an unidentified female said that Hector had just returned from Houston. Nunez's first name is Hector and he is from Houston. In that same call, Hector and Cuevas call each other "cuz." Nunez and Cuevas are cousins.

The fifth call was subject to comparison by the jury with the first four calls because the government played all the calls at trial. The jury had the opportunity to compare the voice, matter of discussion, manner of speech, and use of language in the fifth call with these qualities and characteristics in the first four calls. We view the evidence in the light most favorable to the government, see Miranda, 425 F.3d at 959, and a jury reasonably could have concluded that Nunez was the speaker on these five phone calls.

Second, a jury reasonably could have concluded that the recorded conversations involved illegal activity. Nunez and Cuevas discuss "shirts," a "lady," a "truck driver," "McAllen," and "Ruthie." Special Agent Cromer testified that "shirts" means "cocaine" and sometimes "methamphetamine," "lady" means "cocaine," and he believed "Ruthie" referred to drugs. Cromer explained that "McAllen" is a city in Texas that is an entry point for drugs smuggled into the United States from Mexico and the word "trailer" refers to "a tractor trailer[,] which is one of the common forms of how to transport drugs from McAllen, Texas, to Atlanta." A cooperating co-conspirator also testified that, in his conversations

27

with Cuevas, "one shirt" meant "an ounce of cocaine." The combination of testimony about the meaning of coded language and conversations that "make little facial sense at all but gain a great deal of meaning when viewed as coded references to dealings in [drugs]," United States v. Atkins, 618 F.2d 366, 370 n.4 (5th Cir. 1980), was sufficient evidence to support a finding that Cuevas and Nunez's conversations were about drugs.

Third, it was reasonable for the jury to conclude that the conversations were about cocaine or methamphetamine. Mojica testified that "an ounce of cocaine is one shirt." Cromer testified that "shirts" meant "cocaine," and sometimes "methamphetamine." Cromer also testified that "lady" meant "cocaine." The phone calls support the inference that Nunez was transporting something and it was reasonable to conclude that that something was cocaine.

Fourth, it was reasonable for a jury to conclude that the phone calls were related to the charged conspiracy. Nunez contends that a "buyer-seller relationship" is not sufficient to prove a conspiracy. We recognize that "two parties . . . charged with agreeing to distribute drugs" might not be guilty of conspiracy when the "evidence [demonstrates] that the parties understood their transactions to do no more than support the buyer's personal drug habit," United States v. Dekle, 165 F.3d 826, 830 (11th Cir. 1999), but there was ample evidence

28

that Nunez was involved in much more than supplying whatever personal drug habit Cuevas might have had. Nunez participated in the transportation of drugs in cooperation with the ringleader of the charged conspiracy and used at least some of the same coded language to discuss that conspiracy as had at least one other conspirator. The jury reasonably could have concluded that Nunez was involved in the conspiracy charged in the indictment.

*D. Sufficient Evidence Supported Garcia's Conviction for Possession of a Firearm in Furtherance of a Drug Trafficking Crime.*

Garcia argues that the district court erroneously concluded that sufficient evidence supported his conviction for possession of a firearm in furtherance of a drug trafficking crime. A person violates federal law when "during and in relation to any crime of violence or drug trafficking crime . . . [he] uses or carries a firearm, or . . . , in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A). To be "in furtherance" of a drug trafficking crime, there must be "some nexus between the firearm and the drug selling operation." United States v. Timmons, 283 F.3d 1246, 1253 (11th Cir. 2002) (internal quotations omitted). This argument fails.

Because Garcia testified that the firearm belonged to him, the only question is whether he possessed it "in furtherance" of a drug trafficking crime. Garcia testified that he did not possess the firearm to protect the money, but "when a

29

defendant chooses to testify, he runs the risk that if disbelieved 'the jury might conclude the opposite of his testimony is true.'" Brown, 53 F.3d at 314 (quoting Atkins, 965 F.2d at 961 n.7). Because "a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt," id., the jury was free not only to conclude that Garcia possessed the firearm to protect the money, but also to rely upon that conclusion to convict Garcia. A conclusion of guilt based on Garcia's testimony would have been supported by evidence that Garcia's firearm was in the open drawer of the nightstand in the bedroom, the bedroom and adjoining bathroom contained drugs, a bedroom closet contained a large amount of money that Garcia openly admitted he suspected to be drug proceeds, and Garcia was concerned someone might try to take the money. Sufficient evidence supported Garcia's conviction under section 924.

## IV. CONCLUSION

We affirm the convictions of Garcia and Nunez.

**AFFIRMED.**