[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-12928
_____

D.C. Docket No. 8:14-cr-00092-SCB-JSS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GLADYS FUERTES,
MARIO FUERTES,

Defendants – Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(January 23, 2018)

Before MARCUS, MARTIN, and NEWSOM, Circuit Judges.

MARTIN, Circuit Judge:

Gladys and Mario Fuertes appeal their convictions and sentences imposed after a jury found them guilty of healthcare fraud, conspiracy to commit healthcare fraud, and obstructing a healthcare crime investigation. Ms. Fuertes was also found guilty of aggravated identify theft. After careful consideration, and with the benefit of oral argument, we affirm.

## I. BACKGROUND

Mr. and Ms. Fuertes owned and operated several healthcare clinics in Florida, including GA&S Medical Center ("GA&S"), Morgan Medical & Therapy Center ("Morgan"), Gables Medical & Therapy Center ("Gables"), and NGF Medical Center ("NGF").[1] These clinics all purported to provide medical services to patients and all submitted bills to Universal Health Care ("Universal"), an insurance company.[2] The clinics primarily served patients with severe medical conditions, many of whom had HIV. The Fuerteses sought out HIV patients because insurance companies would generally not question their high-cost medical treatments or prescriptions. Brian Kelly recruited patients, promising to pay them to go to appointments at the Fuerteses' clinics. Patients would also be prescribed Oxycodone, which they would then sell to Mr. Kelly.

---

[1] GA&S listed Ms. Fuertes as a corporate officer. Morgan, Gables, and NGF listed both Mr. and Ms. Fuertes as corporate officers. In addition, Morgan, Gables, and NGF all used the same address in their filings with the Florida Department of State.

[2] Universal received bills from GA&S between January 2008 and September 2009; from Morgan between February 2011 and October 2011; from Gables between March 2011 and August 2012; and from NGF between December 2012 and January 2013.

In 2012, Dennis Dean, a former tenant of Mr. Kelly, received an explanation of benefits from his insurer, Universal.  He noticed that Universal had been billed for over $100,000 in services by Gables that he had not actually received.  He contacted Universal about the over-billing and told Universal that Mr. Kelly recruited patients for Gables and paid patients in pills.

Universal launched an investigation and contacted law enforcement as well as the relevant regulatory agencies.  Universal reported potentially fraudulent billing from GA&S, Morgan, Gables, and NGF, all clinics operated by the Fuerteses.  Universal's billing records from Gables listed Dr. Alvaro Ocampo as performing many different procedures for a small population of patients, including Mr. Dean.  In total, Universal determined that over the course of eight months, Gables billed Universal for close to $1 million in services by Dr. Ocampo, given for only eight patients.  Universal also determined that a different clinic owned by the Fuerteses, NGF, had billed for services for many of the same patients.  When Universal contacted Dr. Ocampo to confirm that he had performed the services that had been billed, he responded that he was not involved with Gables and had not treated the patients in question.

The Fuerteses were later served with a subpoena for all records relating to GA&S, Morgan, Gables, and NGF.  In the records they produced, Dr. Ocampo's name had been crossed out and replaced with another provider's name.  The

3

records also contained appointment notes that had been written after the fact by Miguel Sanchez. Ms. Fuertes had hired Mr. Sanchez to complete forms describing therapies that had purportedly been performed at Gables before he was employed there. One patient, Cathleen Ortega, testified that the Fuerteses met with patients and told them to lie to investigators by saying they had not been paid to attend the clinic and they had been seen by a number of doctors they hadn't actually seen.

On March 13, 2014, Mr. and Ms. Fuertes were charged by indictment with conspiracy to commit healthcare fraud, healthcare fraud, aggravated identity theft, and obstructing a healthcare crime investigation. On March 24, 2015, a jury found Ms. Fuertes guilty of all counts. Mr. Fuertes was found not guilty of the aggravated identify theft counts but guilty of all remaining counts. Ms. Fuertes was sentenced to 234-months imprisonment. Mr. Fuertes was sentenced to 135 months. The court imposed a restitution obligation of $262,229.30 jointly and severally on Mr. and Ms. Fuertes. This appeal followed.

## II. EVIDENTIARY CHALLENGE

The Fuerteses challenge the District Court's admission of evidence relating to (1) the prescription drug scheme; and (2) the Fuerteses' operation of earlier clinics that were not charged. We review for an abuse of discretion the District Court's evidentiary rulings. United States v. Fortenberry, 971 F.2d 717, 721 (11th Cir. 1992).

4

Under Rule 404, evidence of uncharged crimes is not admissible to prove a defendant's character. Fed. R. Evid. 404(b)(1). However, such evidence may be admissible for other purposes, including to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2); Fortenberry, 971 F.2d at 721. The 404(b) restriction on the admission of evidence of uncharged crimes does not apply to conduct that is "intrinsic" to the charged conduct. Fortenberry, 971 F.2d at 721. Evidence of uncharged offenses is "intrinsic" to the charged conduct if it (1) "arose out of the same transaction or series of transactions as the charged offense;" (2) is "necessary to complete the story of the crime;" or (3) is "inextricably intertwined with the evidence regarding the charged offense." United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998) (quotation omitted). Intrinsic evidence is thus admissible "so long as it meets the usual requirements for admissibility of evidence," meaning that it is relevant under Rule 401, and its probative value is not substantially outweighed by unfair prejudice under Rule 403. United States v. Richardson, 764 F.2d 1514, 1522 (11th Cir. 1985).

A. PRESCRIPTION DRUG SCHEME

First, Mr. Fuertes challenges the District Court's admission of evidence relating to the prescription drug scheme. At trial, evidence was presented that Mr. Kelly recruited patients to the clinics, and that they were prescribed Oxycodone,

5

which he would buy, then resell. The District Court admitted this evidence, finding it was intrinsic to the charged conduct and not so prejudicial as to outweigh its probative value. Mr. Fuertes argues this evidence was unfairly prejudicial and unrelated to the charged conduct of healthcare fraud. As a result, he says the District Court should not have admitted this evidence under either Federal Rule of Evidence 403 or 404(b). The government responds by saying that evidence of the Oxycodone scheme was intrinsic to the overall conspiracy to commit healthcare fraud and was not unfairly prejudicial.

The District Court did not abuse its discretion in admitting evidence of the prescription drug scheme. We begin by considering whether the challenged evidence was intrinsic to the charged conduct. While it is true that the Fuerteses were not charged with drug trafficking crimes, the Oxycodone prescription scheme was a part of the overall conspiracy. Indeed, the indictment said that it was "part of the conspiracy that Gladys Fuertes and Mario Fuertes would, and did, facilitate the provision of fraudulent prescriptions for controlled substances, including Oxycodone, to Gables patients/Medicare beneficiaries." It also charged that it was "part of the conspiracy that Brian Kelly would, and did, purchase Oxycodone pills from Gables patients/Medicare beneficiaries for cash and distribute Oxycodone to others in exchange for cash, with Gladys Fuertes' and Mario Fuertes' knowledge and consent." The evidence of this scheme was relevant to showing why patients,

6

and particularly Mr. Kelly (who recruited patients), participated in the conspiracy. It was, in other words, "inextricably intertwined" with the charged conduct and "necessary to complete the story" of explaining Mr. Kelly's and some patients' involvement. See McLean, 138 F.3d at 1403. Because the evidence was intrinsic, it was admissible whether or not it qualified as an exception under Rule 404(b).

Neither did the District Court abuse its discretion in finding the drug scheme evidence relevant under Rule 401, such that its probative value was not substantially outweighed by a risk of unfair prejudice under Rule 403. Richardson, 764 F.3d at 1521. Evidence is "relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). Because this evidence explained why patients and Mr. Kelly participated in the healthcare fraud scheme, it was relevant. And we cannot say that the evidence's probative value was substantially outweighed by its prejudicial value. Evidence is unfairly prejudicial if it would "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180, 117 S. Ct. 644, 650 (1997). While evidence of the drug scheme may have been prejudicial, we cannot say it was unfairly so. As we've explained, the evidence of the drug scheme helped explain the functioning of the healthcare fraud scheme, thus making the evidence probative of the charged conduct. The District Court did not abuse its discretion in admitting this evidence.

7

B. EVIDENCE OF EARLIER CLINICS

Next, the Fuerteses argue the evidence of their operation of earlier fraudulent clinics was admitted in error. At trial, the District Court treated the evidence of earlier clinics the same as evidence of the prescription drug scheme, finding it to be intrinsic, relevant, and not unfairly prejudicial. The Fuerteses argue that evidence of the prior clinics was extrinsic evidence not supported by sufficient proof, and that it was overly prejudicial.

Whether the evidence of the earlier clinics was intrinsic to the charged conduct is a closer question. But even if this evidence were extrinsic to the charged conduct, the District Court did not abuse its discretion in admitting it. To be admissible, extrinsic evidence must satisfy a three-part test:

> First, the evidence must be relevant to an issue other than the defendant's character. Second, as part of the relevance analysis, there must be sufficient proof so that a jury could find that the defendant committed the extrinsic act. Third, the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403.

United States v. Phaknikone, 605 F.3d 1099, 1107 (11th Cir. 2010) (quotations and citations omitted).

Applying this test, the District Court did not abuse its discretion in admitting the evidence of the Fuerteses' operation of earlier clinics. First, the evidence was relevant to an issue other than the Fuerteses' character. That is, using the same methods to commit healthcare fraud across a number of clinics supported a finding

8

that the fraud was knowing and intentional, which was contested at trial.  Second, there was sufficient proof that the jury could find the Fuerteses committed the extrinsic acts.  The government's witness analyzed data on insurance claims from the earlier clinics and testified that millions of dollars in those claims were fraudulent.  Third, the probative value was not substantially outweighed by undue prejudice.

## C. CONFRONTATION CLAUSE

Ms. Fuertes also briefly argues that evidence presented by Richard Ostrom, an expert witness for the government, violated the Confrontation Clause. However, Ms. Fuertes admits that that claim was not raised below and therefore must be reviewed here for plain error.  "Under plain error review, an appellate court may not correct an error not raised at trial unless there is (1) error, (2) that is plain, and (3) that affects substantial rights."  United States v. Arbolaez, 450 F.3d 1283, 1291 (11th Cir. 2006) (per curiam) (quotation omitted).

There was no error in the admission of Mr. Ostrom's testimony.  When Mr. Ostrom opined once on how often a treatment should be administered, defense counsel objected, and the District Court sustained that objection.  Contrary to Ms. Fuertes's allegations, Mr. Ostrom did not otherwise testify "to the hearsay opinion of unidentified doctors that GA&S' billing data was fraudulent and not for necessary medical procedures."  Instead, Mr. Ostrom testified based on his own

review of the clinics' data on insurance claims, as well as other business records, none of which were testimonial for Confrontation Clause purposes. See Crawford v. Washington, 541 U.S. 36, 56, 124 S. Ct. 1354, 1367 (2004); United States v. Naranjo, 634 F.3d 1198, 1213–14 (11th Cir. 2011). Thus, there was no error in the admission of that testimony.

### III.  SUFFICIENCY OF THE EVIDENCE

Mr. Fuertes challenges the sufficiency of the evidence for his convictions. We review de novo a challenge to the sufficiency of the evidence. United States v. Chafin, 808 F.3d 1263, 1268 (11th Cir. 2015). "We examine the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility issues in favor of the guilty verdicts." Id. (quotation omitted and alteration adopted). This Court will not overturn a guilty verdict or disturb the denial of a Rule 29 motion "unless no reasonable trier of fact could find guilt beyond a reasonable doubt." Id. (quotation omitted).

A. HEALTHCARE FRAUD AND CONSPIRACY TO COMMIT HEALTHCARE FRAUD

To prove healthcare fraud under 18 U.S.C. § 1347, the government must show that a defendant:

> knowingly and willfully execute[d], or attempt[ed] to execute, a
> scheme or artifice—
> (1) to defraud any health care benefit program; or
> (2) to obtain, by means of false or fraudulent pretenses,
> representations, or promises, any of the money or property

10

> owned by, or under the custody or control of, any health care
> benefit program,
>
> in connection with the delivery of or payment for health care benefits,
> items, or services . . . .

18 U.S.C. § 1347.  A defendant may also be convicted under a theory of aiding and abetting healthcare fraud if the government proves he "in some way associated himself with the criminal venture, that he wished to bring it about, and that he sought by his actions to make it succeed."  See United States v. Sosa, 777 F.3d 1279, 1292 (11th Cir. 2015) (quotation omitted).

To prove a conspiracy to commit healthcare fraud, the government must show: (1) the existence of a conspiracy to commit healthcare fraud under 18 U.S.C. § 1347; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily joined it.  United States v. Gonzalez, 834 F.3d 1206, 1214 (11th Cir. 2016).  Proof of an express agreement is not required, and the existence of a conspiracy may be inferred from circumstantial evidence.  United States v. Parker, 839 F.2d 1473, 1478 (11th Cir. 1988).

For both his substantive healthcare fraud counts and the conspiracy to commit healthcare fraud count, Mr. Fuertes challenges the sufficiency of the evidence presented to show that he "knowingly and willfully participated in the fraudulent billing schemes."  He says "the evidence established that Mr. Fuertes was an unwitting pawn in a scheme orchestrated by Brian Kelley and perhaps even Gladys Fuertes."

11

The record shows otherwise.  Mr. Fuertes was active in the operations of the fraudulent clinics.  He was the registered agent and a corporate officer for both Gables and Morgan Medical.  He jointly held the bank accounts that were used to get payments from insurance companies and pay kickbacks to clinic patients.  He also signed checks written from those accounts.  The government presented evidence of at least one check that Mr. Fuertes endorsed to cash in order to pay Mr. Kelly and other patients.  Mr. Fuertes also received substantial proceeds from the clinics—over $700,000 from GA&S alone.  A number of patients testified that Mr. Fuertes would often be present at the clinics.  That meant he would have seen that only a very small number of patients actually came in, and at least at Gables, that a doctor was present only one day per week.  The government proved that fraudulent healthcare claims were submitted by the clinics owned and operated by Mr. Fuertes.  Viewing the evidence in the light most favorable to the government, a jury could reasonably infer that Mr. Fuertes sought to make the fraudulent scheme succeed based on evidence that he was involved with the clinics' day-to-day operations; provided cash to pay patients and the patient recruiter; and accepted substantial payments from the clinics.  Sosa, 777 F.3d at 1292.  Sufficient evidence was also presented to allow a reasonable jury to find that Mr. Fuertes entered into an agreement with other participants to execute the healthcare fraud scheme.

12

B. OBSTRUCTION

To prove obstruction of a health care investigation, the government must show that a defendant "willfully prevent[ed], obstruct[ed], misle[d], delay[ed], or attempt[ed] to prevent, obstruct, mislead, or delay the communication of information or records relating to a violation of a Federal health care offense to a criminal investigator."  18 U.S.C. § 1518.

Mr. Fuertes was convicted of two counts of obstruction.  Count 16 related to documents Mr. Fuertes provided in response to a grand jury subpoena.  Mr. Fuertes argues that, even assuming the documents were altered, there was insufficient evidence to prove he altered them or knew they had been altered.  In support, Mr. Fuertes says that he wouldn't have offered to turn over the documents immediately after being personally served with the subpoena (an offer the investigator declined), if he'd intended to alter the documents before submitting them.  Count 17 charged Mr. Fuertes regarding a meeting in which he asked a former patient, Ms. Ortega, to mislead investigators.  Ms. Ortega testified that Mr. Fuertes showed her pictures of doctors, including Dr. Ocampo, and told her to tell investigators that she'd been treated by them.  Mr. Fuertes argues there was insufficient evidence on this count because Ms. Ortega's "testimony was not credible and made no sense," and no other evidence was offered in support of Count 17.

13

Mr. Fuertes's convictions for obstruction were supported by sufficient evidence. For both counts, Mr. Fuertes argues, in essence, that the story presented by the government was not believable. However, Mr. Fuertes is simply reasserting here, the same argument his attorney made at trial. The jury was free to make its own credibility determinations and draw reasonable conclusions from the evidence presented. See United States v. Garcia, 447 F.3d 1327, 1334 (11th Cir. 2006). On appeal, we must draw all inferences in favor of the government, and the testimony of Ms. Ortega and of the FBI investigators who described the falsified medical records was sufficient to support Mr. Fuertes's convictions for obstruction of a healthcare investigation.

## IV.  GUIDELINES CALCULATIONS

The Fuerteses both argue that the District Court erred in (1) calculating their loss amounts; (2) determining the scheme was conducted with "sophisticated means;" and (3) determining their roles in the offense. Ms. Fuertes also argues that her sentence was not reasonable.

"We review a district court's interpretation and application of the Sentencing Guidelines de novo but accept the court's factual findings unless they are clearly erroneous." United States v. Ford, 784 F.3d 1386, 1396 (11th Cir. 2015). A factual finding is clearly erroneous only if we "have a definite and firm conviction that a mistake has been made." Id.

14

A. LOSS AMOUNT

The Fuerteses both argue that the District Court erred in calculating their loss amount. In particular, they argue that the District Court should not have held them accountable for all of the clinics they operated, but rather should have set their sentences based on just their actions related to the clinics for which they were charged. In addition, the Fuerteses argue that the loss amount should have been reduced by the Medicare rate reduction and offset by the amount of legitimate medical services provided. Finally, they argue the loss amount evidence from the uncharged clinics was not sufficiently reliable to include in the calculation.

We review the District Court's calculation of loss amount for clear error. Ford, 784 F.3d at 1396. "[T]he district court is required only to make a reasonable estimate of the loss." Id. We must give the court's estimate "appropriate deference," but it cannot be overly speculative. Id. (quotation omitted). Instead the District Court "must base its estimate on reliable and specific evidence." Id.

1. Relevant Conduct

"When calculating a defendant's sentencing range under the Guidelines, the sentencing court must consider all 'relevant conduct' as defined in [USSG] § 1B1.3." United States v. Siegelman, 786 F.3d 1322, 1332 (11th Cir. 2015). Relevant conduct is defined to include "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of

15

conviction." USSG § 1B1.3(a)(2) (2014). And a "common scheme or plan" is in turn defined as any other offense substantially connected "by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." Id. § 1B1.3 cmt. n.9(A).

The Fuerteses were held responsible for the loss amounts relating to both the charged clinics (Gables and NGF) and uncharged clinics (GA&S and Morgan). This resulted in the Fuerteses being held responsible for $12,493,757.69 in intended loss, but with only $1,075,724.72 attributable to the clinics that were actually charged. However, the uncharged clinics qualify as "relevant conduct" under the Guidelines. All of the clinics had common victims (Universal), a common purpose (Medicare insurance fraud), and a similar modus operandi (charging insurance companies for expensive procedures allegedly performed for patients with HIV). And under our precedent, so long as at least "one of the four factors" substantially connects a prior uncharged offense, it can be included "as relevant conduct when calculating the sentencing range for the [] offense of conviction." Siegelman, 768 F.3d at 1334. The District Court did not clearly err in determining that the schemes at the uncharged clinics were "relevant conduct."

2. Intended Loss

USSG § 2B1.1 defines "loss" as "the greater of actual loss or intended loss." USSG § 2B1.1 cmt. n.3(A) (2014). Intended loss is "the pecuniary harm that was

16

intended to result from the offense," while actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." Id. § 2B1.1 cmt. n.3(A)(i)–(ii) (2014). "Put another way, when a sentencing court is determining the proper punishment for a defendant's fraud, the court uses the reasonable mathematical limit of his scheme, rather than the concrete result. A criminal pays for the ambition of his acts, not their thoroughness." United States v. Patterson, 595 F.3d 1324, 1327 (11th Cir. 2010).

The Fuerteses argue that it was improper to calculate the loss amount using the amount billed because everyone knew that the amounts actually received would be much lower. And in fact, the Fuerteses did receive less than half of the amount for which they were sentenced. However, the District Court found no evidence to show the Fuerteses did not intend to receive as much of the amount billed as possible. As the court observed, the Fuerteses billed over $12 million in claims, and if the government had paid that entire amount, they would have taken it. Because USSG § 2B1.1 bases the calculation on intent, not results, the District Court did not clearly err in setting the loss amount at the amount billed, rather than the amount received.[3]

---

[3] The 2014 version of the Sentencing Guidelines was in effect at the time of Mr. and Ms. Fuertes's sentencing. Some parts of the Guidelines were amended on November 1, 2015, including the definition of "intended loss." Mr. Fuertes argues that the 2015 amendments were clarifying and therefore should be considered on appeal. We need not decide whether the amendments to the Guideline governing loss amount were substantive or clarifying because the

3. Reliable and Specific Evidence

In addition, the Fuerteses argue that the loss amount should have been discounted based on the value of nonfraudulent medical services the clinics actually provided to patients. While the District Court acknowledged that some of the clinics may have provided legitimate medical services, the court ultimately found that "the vast majority of the billings were fraudulent," and the reason the clinics were set up was to commit fraud, not to provide medical services. Having found insufficient evidence to quantify the value of the legitimate services provided, the court calculated loss based on the entire amount billed. This was not clear error. Even on appeal, the Fuerteses do not proffer any value for the legitimate services provided by the clinics, and the evidence was sufficient to tie all of the clinics into the fraudulent scheme. This satisfied the District Court's responsibility to make a "reasonable estimate of the loss." Ford, 784 F.3d at 1396.

B. SOPHISTICATED MEANS

The Fuerteses both challenge the application of a "sophisticated means" enhancement to their sentences. The Guidelines provide for a 2-level enhancement if the offense involved "sophisticated means." USSG § 2B1.1(b)(10)(C) (2014). An offense involves sophisticated means if it includes

District Court considered both the 2014 and 2015 versions when it sentenced Mr. Fuertes and determined the results were the same under either version. This was not clear error.

18

"especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." Id. § 2B1.1 cmt. n.9(B). "There is no requirement that each of a defendant's individual actions be sophisticated in order to impose the enhancement. Rather, it is sufficient if the totality of the scheme was sophisticated." United States v. Ghertler, 605 F.3d 1256, 1267 (11th Cir. 2010). We review for clear error the District Court's finding that a defendant used sophisticated means. Id.

The Fuerteses argue that their scheme "was actually very simple," and that a sophisticated means enhancement was therefore inappropriate. In addition, Mr. Fuertes argues that even if the scheme itself was sophisticated, his role in the scheme was not. The District Court found otherwise. The court found the scheme to be sophisticated because the Fuerteses (1) sought out a small number of particularly complex patients, many of whom were HIV positive, which made extensive billing easier; (2) encouraged patients to sign up with a particular Medicare plan that paid out more easily; (3) stole a doctor's provider information and exaggerated how much another doctor worked; and (4) hired someone to write and alter patient notes after the fact.[4]

---

[4] Ms. Fuertes also argues that it was "double punishment" for the court to base its sophisticated means enhancement on her alteration of documents since she'd already received an obstruction of justice enhancement. Ms. Fuertes cites no authority for this proposition, and in any event, the sophisticated means enhancement can stand on other grounds.

19

On the record before us, we cannot say that the District Court clearly erred. The Fuerteses recruited specific types of patients and targeted specific insurance plans they knew would make it easier for them to get higher payouts. And they hired Mr. Sanchez to create thousands of patient treatment records in an attempt to make their scheme harder to detect. In addition, the Fuerteses transferred proceeds from the scheme across many different personal and business bank accounts to make it more difficult to trace. And even if Mr. Fuertes's role in the scheme was more minor than Ms. Fuertes's (as the District Court recognized), evidence was presented to show that he intentionally participated in the scheme.[5] Considering the totality of the scheme rather than each defendant's individual actions, it was not clear error for the District Court to apply the sophisticated means enhancement. See Ghertler, 605 F.3d at 1267.

## C.  LEADERSHIP ROLES

The Fuerteses both challenge the District Court's decisions about their respective roles in the scheme. Ms. Fuertes argues that the District Court erred in applying a 4-level enhancement for her aggravating role in the offense. Mr. Fuertes argues that the District Court erred in not applying a 2-level reduction for his mitigating role in the offense.

---

[5] Similar to his argument on the intended loss amount, Mr. Fuertes also argues that we should retroactively apply the 2015 amendments to the Guidelines relating to sophisticated means. However, the District Court considered the language on sophisticated means in both the 2014 and 2015 versions of the Guidelines and determined Mr. Fuertes qualified under either version. This was not clear error.

Under § 3B1.1(a), a sentencing court may apply a 4-level enhancement if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." And under § 3B1.2, a sentencing court may apply a 2-level reduction if the defendant was a "minor participant." In assessing the defendant's role in an offense, the District Court considers both "the defendant's role in the relevant conduct for which []he has been held accountable at sentencing" and his "role as compared to that of other participants in [the] relevant conduct." United States v. De Varon, 175 F.3d 930, 940 (11th Cir. 1999). The District Court's determination of a defendant's role in the offense is reviewed only for clear error. Id. at 937.

The District Court did not clearly err in enhancing Ms. Fuertes's sentence as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." See USSG § 3B1.1(a) (2014). Ms. Fuertes argues both that the scheme was not "otherwise extensive" and that it did not involve five or more people. But she cannot show that either of those findings were in error, as she must in order to undermine her enhancement. In particular, the District Court did not err in finding that the fraud was "otherwise extensive" based on the number of patients, doctors, and billing companies involved. And while Ms. Fuertes argues that some of these actors did not knowingly participate in the fraud, in determining whether a scheme was otherwise extensive, "all persons involved

21

during the course of the entire offense are to be considered, including outsiders who provide unknowing services." United States v. Holland, 22 F.3d 1040, 1045 (11th Cir. 1994) (quotation omitted).

Neither did the District Court clearly err in declining to reduce Mr. Fuertes's sentence as a "minor participant." While the District Court acknowledged that Mr. Fuertes was less culpable than Ms. Fuertes, that did not mean that Mr. Fuertes was necessarily deserving of a minor role adjustment. The District Court found that Mr. Fuertes received a substantial part of the proceeds of the scheme, was named on several bank accounts, was a registered agent for some of the clinics and the Vice President at Gables, and was clearly involved in attempts to cover up the scheme. The District Court did not clearly err in finding this behavior did not make Mr. Fuertes less culpable than most other participants in the scheme. See De Varon, 175 F.3d at 944.

D. PROCEDURAL AND SUBSTANTIVE REASONABLENESS

Last, Ms. Fuertes argues that her sentence was not substantively reasonable. We review the reasonableness of a sentence for abuse of discretion. Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007). Reasonableness review is a two-step process. First, we review for procedural error, "such as miscalculating the advisory guidelines range, treating the guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence based on clearly

22

erroneous facts, or failing to adequately explain the chosen sentence." United States v. Cubero, 754 F.3d 888, 892 (11th Cir. 2014). Second, we review whether the sentence was substantively unreasonable "under the totality of the circumstances and in light of the § 3553(a) factors." Id. The party challenging the sentence bears the burden of showing it is unreasonable. Id. at 893.

Ms. Fuertes's claims of procedural error mirror her Guidelines claims that we have already addressed. As to substantive reasonableness, Ms. Fuertes was sentenced to 234-months imprisonment, which was in the middle of her guideline range. Ms. Fuertes argues this sentence was unreasonable because the court did not consider her family and employment history, and was longer than necessary to achieve the sentencing goals. But the District Court did consider all of those factors. Given the facts of Ms. Fuertes's case, we are not "left with the definite and firm conviction that the district court committed a clear error of judgment" in setting Ms. Fuertes's sentence. Cubero, 754 F.3d at 893 (quotation omitted).

## V.  CONCLUSION

We affirm both defendants' convictions and sentences for healthcare fraud, conspiracy to commit healthcare fraud, obstructing a healthcare crime investigation, and aggravated identify theft.

**AFFIRMED.**