[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-12947
_____

D.C. Docket No. 0:15-cr-60209-WPD-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BECHIR DELVA,
DAN KENNY DELVA,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 29, 2019)

Before MARCUS, GRANT and HULL, Circuit Judges.

HULL, Circuit Judge:

Defendants Bechir Delva and Dan "Kenny" Delva are brothers who were convicted of seven crimes arising out of their identity theft and tax fraud operations.  After a joint jury trial, the Delvas appeal their convictions and sentences for conspiracy to possess 15 or more unauthorized access devices, in violation of 18 U.S.C. § 1029(b)(2), possession of 15 or more unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).

On appeal, Bechir and Kenny raise separate and joint challenges to their convictions and sentences.  First, Bechir attacks his convictions on the ground that the district court erred in denying his motion to suppress the evidence found during a warrantless search of his vehicle.  Second, Kenny challenges the sufficiency of the evidence supporting each of his convictions.  Together, Bechir and Kenny argue that: (1) the district court erred by admitting at trial the government's expert testimony as to the terminology and jargon used in identity theft and tax fraud crimes; and (2) the district court's errors singularly and cumulatively violated their constitutional rights to a fair trial and due process of law.

As to their sentences, Bechir and Kenny argue that the district court erred in applying an enhancement for possession of a firearm in connection with their offenses.  Lastly, Kenny contends that his total 84-month sentence is substantively unreasonable.

2

After careful review of the record and the parties' briefs, and with the benefit of oral argument, we affirm both Delvas' convictions and sentences.

## I.  FACTUAL BACKGROUND

We describe the government's June 9, 2014, undercover investigation into the Delvas' fraud operations, including the federal agents' search of Bechir's vehicle and the townhouse where the fraud was conducted.  This investigation and the evidence seized from the car and townhouse formed the basis of the federal prosecution of this case.  Our description is based on the evidence presented at trial, as well as testimony during a pre-trial suppression hearing.

### A.     Undercover Operation

A cooperating source, McKenzie Francois, told federal agents that Bechir and Kenny Delva were conducting identity theft and tax fraud operations out of a townhouse located within a gated community complex in Miramar, Florida. Acting on this information, the Agents set up an undercover operation with Francois, which targeted the townhouse.  On June 9, 2014, Special Agents Kevin Deslauriers, Brian Eustice, and Geoffrey Goodwin from Homeland Security Investigations and Special Agent Brad Cohen from the Internal Revenue Service ("IRS") met with Francois at a staging location.  The Agents equipped Francois with a video and audio recording device in a backpack and followed him to the townhouse in question.  One Agent parked his car with a view of the townhouse's

3

front door, while other Agents parked where they could observe the building's rear.

At approximately 12:05 p.m., Francois entered the townhouse and stayed for about an hour. Bechir, Kenny, and others were present in the townhouse at that time. While inside, Francois took several pictures with his cell phone and texted them to the Agents. The pictures showed: (1) individuals sitting on a couch using laptops; (2) a money counter; (3) a white shoebox lid flipped upside down with numerous debit cards and papers containing personal identifying information inside setting on top of an ottoman; and (4) an AR-15 rifle leaning against a wall. Generally, the personal identifying information included individuals' names, dates of birth, and Social Security numbers, which we collectively refer to as "PII."

Consistent with these photographs, the video recording covertly captured by Francois depicted papers listing PII and debit cards visible on the ottoman and a rifle leaning against a wall. Kenny and Bechir could be heard speaking on the recording. Bechir was sitting on a couch facing the ottoman where the debit cards and papers were located. At one point on the video, Kenny is holding papers and a laptop power cord. The video also showed that, soon after Francois arrived, the individuals discovered a government Agent surveilling the townhouse. This prompted a discussion about whether the Agent could "pick up" on who was "sending things" over the internet. They also talked about packing up, "cleaning

4

up" the townhouse, and leaving to "work" at a hotel. Kenny, in particular, talked about leaving the townhouse and going to a hotel where it would be safer to work. Around this time, someone else accused Kenny of looking scared, and Bechir referenced someone going to jail.

## B.    Agents Debrief Francois

After leaving the townhouse, Francois met with the Agents again and confirmed that individuals in the townhouse were conducting fraud activities. Francois also told the Agents that the individuals noticed a law enforcement officer outside the townhouse and were worried that they were being surveilled. As such, they talked about "cleaning" the townhouse and getting rid of any illicit materials as soon as possible. The Agents then did the following: Agent Eustice returned to the gated community to watch the townhouse; Agent Deslauriers took the video equipment back to his office for review; and Agent Goodwin went to secure a federal search warrant.

## C.    Agents Initially Search the Mercedes

At about 2:00 p.m., Agent Eustice returned to the townhouse and saw several vehicles lined up in front of the residence. Agent Eustice first saw an unidentified male put a bag into the back of a white Camry and drive away from the townhouse. Agent Eustice tried to follow the car, but lost it at the front gate. Agent Eustice then saw another male, later identified as Bechir, walk down a

5

hallway to the townhouse door.  Bechir left the townhouse carrying three white shoeboxes and a black backpack, which he loaded into a Mercedes-Benz vehicle. Bechir then departed the townhouse (Unit 105, Building 2492) and drove along the main Centergate Drive.  After driving around a curve in the road, Bechir got off that main drag and turned into one of the other apartment communities within the complex.  Bechir parked and began walking away from the car.

By this time, two other Agents had joined Agent Eustice at the scene, and they approached Bechir together.  When asked, Bechir denied owning the Mercedes and refused to provide the officers with any identification.  The Agents then handcuffed Bechir and eventually placed him in the back of a police car. Looking in the windows of the parked Mercedes, Agent Eustice saw the three shoeboxes that Bechir had loaded into the car.  He noticed that one box was ajar and appeared to have credit cards inside.

At approximately 4:15 p.m., Agent Deslauriers returned to the scene after watching the undercover video.  Although part of the recorded conversation was in Haitian Creole, which Agent Deslauriers did not understand, he noticed a "heightened sense of urgency at the end" of the video, which corroborated what Francois had told them.

When Agent Deslauriers arrived, Agent Eustice fully briefed him on what had transpired with Bechir.  Agent Deslauriers recognized Bechir from the

6

undercover video.  When he looked in the back of the Mercedes, he also saw the boxes.  The boxes looked similar to the box lid Agent Deslauriers saw in Francois's pictures and on the undercover video.  Additionally, one of the boxes was slightly ajar, and Agent Deslauriers could see what looked like credit cards inside.

Based on the video, the pictures, and the information provided by Francois, Agent Deslauriers believed there was PII and fraudulent credit cards in the box.  Agent Deslauriers then opened the Mercedes door, did a cursory search of the boxes, and found stacks of credit cards and papers listing PII.  He took a few photographs and then replaced everything.

## D.    Agents Search the Mercedes and Townhouse

Meanwhile, Agent Goodwin secured a search warrant and returned to the townhouse around 8:30 p.m.  The Agents then conducted a thorough search of the Mercedes and the townhouse.  Within the three boxes in the Mercedes, the Agents found (1) hundreds of prepaid debit cards, (2) Bechir's T-Mobile bill, (3) a bill addressed to Kenny, and (4) scores of documents containing PII, including notebooks, handwritten lists, and Excel spreadsheets.  The documents with the PII listed the names, birthdates, and Social Security numbers of hundreds of individuals.  In the black backpack, the Agents found a laptop computer, as well as additional papers with PII.

In the townhouse, the Agents discovered a safe with $29,000 inside, two money counters, and even more credit cards and more documents listing PII. The Agents also found (1) tax guidelines from Republic Bank and Trust Company, (2) documents listing an electronic filing identification number ("EFIN") for Gustavo Cruz of Cruz Tax Services, (3) a boxful of prepaid debit cards, (4) a Playhouse Gentleman's Club VIP card in Bechir's name, and (5) a letter to Kenny from the IRS. The Agents also found two rifles and a handgun, with multiple corresponding magazines and rounds of ammunition, and receipts showing that Kenny had purchased the firearms.

In the townhouse garage, Agents found Bechir's Haitian passport, Kenny's Audi service contract, Kenny's insurance records, documents related to Gustavo Cruz, a record showing a parcel was shipped to the IRS, and instructions for obtaining an EFIN.

## E.    Bechir's Interview and Written Statement

After searching the townhouse, the Agents apprised Bechir of his Miranda rights[1] and interviewed him. Bechir told the Agents that all of the personal identifying information (the PII) was his. Bechir had obtained the information (the PII), which he called "fos" and "infos," from an online database, using a login and

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

password.  Bechir told the Agents that he used the personal identifying information (the PII) to file fraudulent tax returns online using an EFIN that he bought on the street for $5,000.  Bechir would receive the tax refunds on debit cards, which he used at ATMs to withdraw cash.  Bechir admitted that the money the Agents found in the townhouse was from tax fraud.  He also said the Mercedes belonged to him and Kenny had an Audi in the garage.  When asked about the firearms, Bechir told the Agents that the guns belonged to Kenny.  Bechir explained that the firearms were in the townhouse for protection.

In his signed written statement, Bechir also admitted to conducting fraud activities and keeping firearms at the townhouse for protection from getting robbed:

> I'm Bechir Delva, [and] freely and willing admit that the money I store in the safe and all the fraud activities here at 2492 Centergate Drive, Miramar, Florida, Unit 105, are mine.  The money in the safe is from fraud and [I] have conducted fraud here.  I had legal guns here, rifles and handguns.  I kept them here for protection from getting robbed.

The Agents did not arrest or question Kenny on June 9, 2014, as he had left the townhouse by the time they searched it.

## II.  PRE-TRIAL PROCEEDINGS

### A.    Indictment and Not Guilty Pleas

In August 2015, a federal grand jury charged both Bechir and Kenny with:

(1) one count of conspiracy to possess 15 or more unauthorized access devices, i.e.,

9

Social Security numbers and debit cards issued to other people, in violation of 18

U.S.C. § 1029(b)(2) ("Count 1"); (2) one count of possession of 15 or more

unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3) ("Count 2");

and (3) five counts of aggravated identity theft, in violation of 18 U.S.C.

§ 1028A(a)(1) ("Counts 3-7").  The aggravated identity theft counts were tied to

specific real individuals whose PII was recovered from the spreadsheets in the

Mercedes, namely, L.C. (Count 3), J.F. (Count 4), C.L. (Count 5), D.S. (Count 6),

and G.S. (Count 7).  The Delvas pleaded not guilty, and the case proceeded to a

joint trial.

## B.    Bechir's Suppression Motion

Before trial, Bechir filed a motion to suppress the physical evidence seized

from his Mercedes.[2]  Bechir's motion claimed that he was illegally detained on

June 9 and that the initial warrantless search of his vehicle was illegal.  The district

court conducted an evidentiary hearing, during which Agents Deslauriers and

Eustice testified for the government.  They described the June 9, 2014, events as

detailed above.  Bechir did not testify at the hearing.

At the end of the hearing, the district court denied Bechir's suppression

motion.  In its written order, the district court first found that one of the boxes in

---

[2]Bechir did not challenge the search of the townhouse or move to suppress the post-Miranda statements he made to the federal agents.  Kenny did not file a suppression motion at all.

10

the Mercedes was ajar, revealing credit cards inside.  Next, the court determined that the fact that the boxes and credit cards were in plain view, combined with information Francois provided to the Agents, created sufficient probable cause to justify searching the vehicle.  Therefore, based on the automobile exception announced in Carroll v. United States, 267 U.S. 132, 45 S. Ct. 280 (1925), the district court determined that the Agents had authorization to search the Mercedes and the boxes at the time when they first detained Bechir.  The district court stressed that they did not search the vehicle until after Agent Deslauriers had watched the undercover video, which the court said clearly depicted fraud.  Alternatively, the district court concluded that the inevitable discovery doctrine justified the search because the Agents secured a search warrant later that day.

## III.  THE JOINT TRIAL

In February 2016, the case proceeded to a joint trial, which lasted five days.  As Kenny challenges his convictions based on the sufficiency of the evidence, and both Delvas argue that the introduction of certain expert testimony was improper, we will review more of the evidence presented at trial.

## A.    The Government's Evidence

During the trial, the government presented testimony from 18 witnesses, including Agents Deslauriers, Eustice, Goodwin, and Cohen.  The Agents described the events on June 9, 2014, as we have recounted them above, including

11

testifying as to Bechir's post-Miranda interview statements and written confession. The government also introduced the physical evidence the Agents obtained on June 9, that is, Francois's undercover video and pictures, as well as the evidence Agents seized from Bechir's Mercedes and the townhouse. In particular, the government introduced two Excel spreadsheets that were found in Bechir's car, which listed the names, birthdates, and Social Security numbers of the five victims specifically named in Counts 3-7 of the indictment. Agent Deslauriers also explained subsequent steps the Agents took to investigate the Delvas' fraud scheme, such as sending some of the seized evidence to a forensic lab for fingerprint analysis.

Fingerprint specialist Genius Johnson then testified that he compared Bechir's and Kenny's fingerprints to those he recovered from two documents containing PII that were seized in the case. On one document, Johnson found one latent fingerprint left by Bechir, and on another spreadsheet, Johnson found four latent fingerprints left by Kenny. Johnson testified that it was impossible that someone other than Bechir and Kenny left those fingerprints on the papers.

The government also called Detective Kenneth Sealy as an expert witness in identity theft and tax fraud and the terminology and jargon used in this type of crime. Sealy is a Detective with the Aventura Police Department who had been assigned to the IRS Identity Theft Task Force for four years. Detective Sealy had received training on identity theft crimes from several different institutions,

12

including from the IRS, U.S. Secret Service, Citibank, Homeland Security, Discover Card, Broward Community College, and the Broward College Police Academy.  Detective Sealy's training with the IRS was specifically focused on the ways in which fraudulent tax returns are filed with stolen identities to obtain refunds and how to investigate those types of crimes.  Sealy explained that the term "stolen identity refund fraud" referred to the use of stolen identities—individuals' names, dates of birth, and Social Security numbers—to file fraudulent income tax returns with the IRS to obtain a refund.

As to experience, Detective Sealy had conducted more than 75 fraud investigations, including in 50 tax fraud cases.  Detective Sealy had also listened in on over 30 jail calls placed by defendants charged with "stolen identity refund fraud" and debriefed over 20 such cooperating defendants.  From the phone calls and debriefs, Detective Sealy learned the methods by which "stolen identity refund fraud" is conducted and the terminology used in that type of fraud.  Detective Sealy explained that, in the majority of the tax fraud cases he investigated, the criminals used coded terminology.  As part of his investigations, Detective Sealy also had worked undercover to purchase, or arrange for the purchase of, PII from individuals engaged in fraud.  Sealy explained that PII usually refers to people's names, dates of birth, and Social Security numbers.  Based on his expertise, Detective Sealy had taught fraud classes to other police departments and colleges

13

and had previously testified in a case in federal court as an expert in fraud investigations and terminology.

Detective Sealy testified that criminals committing "stolen identity refund fraud" obtain PII from multiple sources, including online or from people who work at schools, banks, hospitals, or at other places where they have access to such information. In reviewing the documents seized in this case, Detective Sealy confirmed that they appeared to be medical billing sheets, Excel spreadsheets listing PII, and hospital patient printouts, which were consistent with the type of records he had found in other "stolen identity refund fraud" cases. On the Excel spreadsheets, Detective Sealy noted that someone had handwritten checkmarks, Xs, and debit card account numbers alongside the specific PII entries. He explained that the handwritten notations indicated whether the participant had been successful or not in using the listed individual's PII in the fraud scheme.

Next, Detective Sealy generally described how "stolen identity refund fraud" works. He explained that once the fraudsters obtain the PII, they input that information into an online tax preparation website and then report fictitious earnings, as if they were preparing real tax returns. When filing the fraudulent tax returns, the criminals elect to have the tax refund deposited onto prepaid debit cards, which are linked to online checking accounts. These fraudulent tax returns

are typically filed in volume to increase the likelihood of successfully obtaining refunds.

As to terminology, Detective Sealy testified that "fos" is a common slang term that identity fraudsters use in South Florida, and it means "info" or "information," like an individual's name, date of birth, and Social Security number. The government then played portions of the undercover video and asked Detective Sealy follow-up questions. For instance, after reviewing when an individual in the townhouse said, "[w]hen you work over and over, and you send everything at once, and you're done, that's better," Detective Sealy testified that "work" in this context typically means either opening credit card accounts or filing fraudulent tax returns. And when individuals in the townhouse mentioned "PD," such as "My PDs always go," Detective Sealy testified that PD typically refers to personal drops—that is, the actual deposit of tax refunds from the U.S. Treasury to the account associated with a debit card.

Detective Sealy also explained that when an individual said, "I never check the confirmation," the term "confirmation" usually refers to checking the status of a tax refund on the IRS website. More still, after another individual said on the video, "I'm going to have these chicks buy me some plastic," Detective Sealy testified that "plastic" refers to debit cards or credit cards. He said that criminals

involved in this type of fraud commonly have third parties purchase the debit cards for them in order for the fraudsters themselves to avoid store surveillance cameras.

The government then played a video clip where the individuals were discussing leaving the townhouse and going to a hotel because they were concerned that law enforcement was monitoring them. Detective Sealy confirmed that, in his experience, individuals committing "stolen identity refund fraud" often work out of hotels because using a hotel's wi-fi internet makes it more difficult for law enforcement to track the fraud.

Next, Yamile Colt, a witness from the Social Security Administration, testified. Colt had examined a list of approximately 1,696 Social Security numbers, which were all found within the documentary evidence seized from the Mercedes and townhouse. Colt determined that all but 16 of the 1,696 numbers were legitimate Social Security numbers that belonged to real people.

Included in that list were the names and Social Security numbers for the five individuals named in Counts 3 through 7 of the indictment. Three of the named individuals came to trial and testified that their PII appeared on documents seized from the Mercedes, but that they had never given the Delvas permission to use their PII and did not recognize either Bechir or Kenny.

Joanna Steisel, an IRS Analyst, then testified. Steisel explained that, when someone electronically files a federal tax return, the IRS conducts what is called a

16

24-hour check, where it verifies the accuracy of certain PII against its system.

Steisel also explained that the IRS assigns EFINs to tax preparation businesses so

that they can submit a large number of tax returns online on behalf of other people.

There is no limit to the number of returns you can file with an EFIN.

As to the Delvas' fraud specifically, Steisel testified that she had reviewed

six pages of PII that the Agents recovered from Bechir's Mercedes. The IRS

Analyst looked at whether the handwritten debit account numbers on those pages

of PII were associated with filed tax returns. She discovered that the accounts

were linked to 21 fraudulent tax returns that had been filed in March and April of

2014. These fraudulent tax returns had requested a total of $186,697 in tax

refunds. Of the requested refunds, the IRS directly deposited $51,441 in tax

refunds to the listed accounts. The fraudulent tax returns were all filed using

Gustavo Cruz's EFIN.

After the government rested, the Delvas moved under Rule 29 of the Federal

Rules of Criminal Procedure for a judgment of acquittal. The district court denied

the Rule 29 motions.

**B.    Bechir Testifies**

Bechir then testified on his own behalf. Bechir explained that, on June 9,

2014, he was living at his parents' house, but went over to the townhouse to spend

time with friends. Bechir said that the townhouse belonged to a relative who was

out of the country, but that Francois was living there at that time with his cousins. Bechir had known Francois since they were children, as their parents were neighbors.

Sometime after Bechir arrived, Francois and Kenny came over to the townhouse too. According to Bechir, Francois warned him that the police were watching and asked him to move some boxes out of the townhouse. Bechir complied, carried Francois's boxes to the Mercedes, and then moved his car to another parking space. This is when the Special Agents confronted him. Bechir testified that, after the Agents handcuffed him, they eventually took him back to the townhouse, but he denied making any statements to the Agents that day. When confronted with his written post-Miranda statement, Bechir explained that he was scared and wrote exactly what an Agent told him to write.

On cross-examination, Bechir testified that he would go to the townhouse once in a while to play videogames and basketball, but he was rarely there. Bechir confirmed that he did not stay at the townhouse; rather, he stayed at his mother's house. When Bechir arrived on June 9, Francois's cousins were on their computers, and the guns, papers, and debit cards were in the townhouse. Bechir admitted to seeing papers everywhere, but denied seeing any PII. Instead, he thought the personal information was fake. Bechir testified that the papers, PII,

18

and debit cards all belonged to Francois and his cousins.  None of it belonged to him or to Kenny.

The government then confronted Bechir with portions of the undercover video.  After viewing the clip where individuals were talking about the police watching the townhouse, Bechir testified that he was not concerned about the police presence because he was just at the townhouse to hang out.  When the government asked why Bechir was talking about jail on the recording, Bechir said he was making a joke.  Bechir admitted to seeing Kenny on the video recording, but denied that Kenny was using a computer.  Bechir also testified that he did not know why Kenny was talking about going to a hotel or why it would be safer at a hotel, explaining too that Kenny never told him anything about filing taxes at a hotel.  Bechir acknowledged that, after people on the video discussed the police, someone told Kenny that he looked scared, but Bechir said that Kenny was "not scared at all."  Bechir also agreed that, moments later, Kenny was holding papers, but Bechir denied that it looked like Kenny was "packing up."

Bechir did confirm that it was Kenny who said on the recording, "You know when you work over and over, and you send everything at once, and you're done, that's better."  Bechir, however, did not know what "work" meant in that statement because Kenny was speaking in "code" or "street language."  Bechir also did not know what Kenny meant when he said: "I'm going to have these chicks buy me

19

some plastic." Bechir maintained that he had no knowledge that Kenny was involved in filing fraudulent tax returns.

While Bechir testified that Kenny bought the firearms found in the townhouse, Bechir said that they were there for recreational use at a gun range—not to protect the stolen identities or tax fraud proceeds. Though Bechir admitted to moving the boxes to his car, he denied opening the boxes himself. Bechir claimed that everything in the boxes belonged to Francois and his cousins. When the government showed Bechir that his phone bill was found in one of those boxes, Bechir could not explain how it got there, but suggested the Agents had planted it to frame him. Bechir also did not know how his passport ended up in the townhouse's garage.

Kenny did not testify and the defense rested.

## C.    The Verdict and Sentences

The Delvas then renewed their Rule 29 motions. Noting that "the government's case got stronger with the cross-examination of Bechir," the district court denied the motions. After deliberating, the jury found Bechir and Kenny guilty on all counts. The district court sentenced Bechir to 102 months' imprisonment and Kenny to 84 months' imprisonment. This is the Delvas' appeal.

## IV.  BECHIR'S SUPPRESSION MOTION

On appeal, Bechir argues that the district court erred in denying his pre-trial

suppression motion and then admitting into evidence the physical items seized from his Mercedes.[3]  Bechir contends that no probable cause existed for the Agents to search his car before obtaining a warrant.[4]

## A.    Automobile Exception

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  To guarantee this right, the Fourth Amendment generally requires law enforcement officials to obtain a warrant before conducting a search.  United States v. Watts, 329 F.3d 1282, 1284 (11th Cir. 2003).  There are, however, exceptions.  Id.

Under the automobile exception to the warrant requirement, "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."  California v. Acevedo, 500

---

[3]"A denial of a motion to suppress involves mixed questions of fact and law.  We review factual findings for clear error, and view the evidence in the light most favorable to the prevailing party.  We review de novo the application of the law to the facts."  United States v. Barber, 777 F.3d 1303, 1304 (11th Cir. 2015) (citations omitted).

[4]On appeal, Bechir does not challenge the admission of the physical evidence seized from the townhouse or his oral and written confessions.  In his brief, however, Bechir mentions in an argument summary and heading that the district court erred in failing to suppress his "arrest" and that no probable cause existed for the Agents to stop him as he walked away from his Mercedes.  But other than simply stating this issue, Bechir does not explain or discuss it any further.

Because Bechir has not sufficiently raised this detention issue on appeal, he has abandoned it.  See Singh v. U.S. Att'y Gen., 561 F.3d 1275, 1278 (11th Cir. 2009) ("[A]n appellant's simply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal.").

21

U.S. 565, 580, 111 S. Ct. 1982, 1991 (1991); United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005). For a warrantless search of an automobile to be constitutional, "(1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime." United States v. Lanzon, 639 F.3d 1293, 1299–300 (11th Cir. 2011).

Probable cause exists to conduct a warrantless search when "there is a fair probability that contraband or evidence of a crime will be found in the vehicle" under the totality of the circumstances. United States v. Tamari, 454 F.3d 1259, 1261–62 (11th Cir. 2006) (quotations omitted). Facts provided by a confidential informant and then independently corroborated by the government can support probable cause to believe that a vehicle contains contraband. United States v. Talley, 108 F.3d 277, 281–82 (11th Cir. 1997).

There is no dispute in this case that the Mercedes was operational. Our inquiry is limited to determining whether probable cause existed to allow the warrantless search of the vehicle. Upon review of the record, we readily conclude that Agent Deslauriers had probable cause to conduct the initial search of the Mercedes because there was a fair probability that the car contained evidence of a crime.

To begin with, Francois told the Agents that Bechir and Kenny were conducting identity theft and tax fraud operations out of the townhouse. To

investigate this tip, the Agents equipped Francois with a recording device and sent him to the townhouse on June 9, 2014. While inside, Francois took pictures and sent them to the Agents, which showed a white shoebox lid flipped upside down containing numerous debit cards and documents listing PII, multiple people using laptops, a money counter, and a firearm. Francois's covert video recording further corroborated his account of Bechir's and Kenny's fraud operations.

After leaving the townhouse, Francois told the Agents that the individuals knew law enforcement was surveilling the townhouse and planned to relocate their operations and remove the fraud-related materials from the townhouse as soon as possible. Consistent with Francois's account, when Agent Eustice returned to the townhouse, he saw Bechir removing three white shoeboxes and a backpack from the townhouse and loading them in his Mercedes. The Agents had seen a white shoebox lid containing debit cards and papers with PII in both the pictures from Francois and in the undercover video.

And when Agents Eustice and Deslauriers looked through the windows of the parked Mercedes, they could see the boxes in the car. One box lid was ajar, and the Agents saw what appeared to be credit or debit cards inside. Given the totality of these circumstances, at that point, a reasonable Agent could deduce with a fair probability that the Mercedes contained evidence of a crime. See Tamari,

23

454 F.3d at 1261–62.  Thus, the Agents were entitled to search the Mercedes under the automobile exception to the warrant requirement.

We recognize that Bechir argues, in a conclusory fashion, that no probable cause existed to search the car because the Agents could not see evidence of fraud in plain view in the Mercedes.[5]  Based on the uncontroverted testimony of Agents Deslauriers and Eustice, however, the district court found as fact that the boxes and credit cards were in plain view in the Mercedes.  To the extent that Bechir is challenging this factual finding, he has not shown that it was clearly erroneous.

Before concluding, we address one final suppression issue.  During the trial, Bechir disavowed any connection to the activities inside the townhouse, or to the townhouse itself at that time.  Bechir maintained that he did not live at the townhouse or otherwise stay there.  In fact, Bechir said that he was rarely at the townhouse and only visited once in a while.  During the district court proceedings and in the suppression motion, in particular, Bechir never claimed that his Mercedes was parked in front of the townhouse or within its curtilage when the Agents initially searched it without a warrant.

---

[5]For the first time on appeal, Bechir contends that the district court incorrectly found that the search of his Mercedes was permissible as a vehicle search incident to arrest under Arizona v. Gant, 556 U.S. 332, 129 S. Ct. 1710 (2009).  This, however, was not the basis for the district court's denial of Bechir's motion to suppress.  As we set forth earlier, the district court found that the search of the Mercedes was valid under the automobile exception and, alternatively, under the inevitable discovery doctrine.  Because we conclude that the search was valid under the automobile exception and, alternatively, the inevitable discovery doctrine, we need not examine the search-incident-to-arrest exception.

24

Yet, before oral argument, Bechir filed a Federal Rule of Appellate Procedure 28(j) letter citing Collins v. Virginia, 584 U.S. __, 138 S. Ct. 1663 (2018), which addresses searching a vehicle within the curtilage of a home. To the extent that Bechir seeks to raise a home-curtilage issue as to his vehicle, Bechir's reliance on Collins is misplaced. The facts in Collins involved a warrantless search of a motorcycle that was parked at the top of a driveway that "abut[ted] the house" of the defendant's girlfriend. Id. at __, 138 S. Ct. at 1671. The Supreme Court determined that the part of the driveway where the defendant's motorcycle was parked and subsequently searched constituted curtilage of the home. Id. The question posed was "whether the automobile exception justifies the invasion of the curtilage" of a home. Id. The Supreme Court then considered the relationship between the Fourth Amendment protections provided to the curtilage of a home and the automobile exception. Id. at __, 138 S. Ct. at 1675. Ultimately, the Supreme Court held that "the automobile exception does not permit an officer without a warrant to enter a home or its curtilage in order to search a vehicle therein." Id. (emphasis added).

In contrast to Collins, Bechir's Mercedes, at the time of the search, was no longer at the townhouse or parked in a driveway abutting the townhouse. Rather, Bechir departed the townhouse (Unit 105, Building 2492) and drove along the main Centergate Drive. After driving around a curve in the road, Bechir got off

that main drag and turned into one of the other apartment communities within the complex and parked.  That parking area was not within the curtilage of the townhouse where the Delvas conducted their fraud activities.  See Florida v. Jardines, 569 U.S. 1, 6, 133 S. Ct. 1409, 1414 (2013) (instructing that the area "immediately surrounding and associated with the home"—the curtilage—is "part of the home itself for Fourth Amendment purposes"); United States v. Taylor, 458 F.3d 1201, 1206 (11th Cir. 2006) (A home's curtilage is "[t]he private property immediately adjacent to a home."); Collins, 584 U.S. at __, 138 S. Ct. at 1671 (explaining that the driveway abutting the house is "an area adjacent to the home and to which the activity of home life extends, and so is properly considered curtilage" (quotations omitted)).  Therefore, Collins does not help Bechir.

## B.    Inevitable Discovery Doctrine

As an independent and alternative ground, we also conclude that the evidence obtained from the warrantless search of the Mercedes was admissible under the inevitable discovery doctrine.  "Under the exception for 'inevitable discovery,' the government may introduce evidence that was obtained by an illegal search if the government can establish a reasonable probability that the evidence in question would have been discovered by lawful means."  United States v. Johnson, 777 F.3d 1270, 1274 (11th Cir. 2015) (quotations omitted).  The government must

26

show that "the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." Id. (quotations omitted).

Here, in addition to obtaining a warrant to search the Mercedes later that same day, the Agents were actively pursuing that warrant before they initially searched the Mercedes. Agent Goodwin went to secure a federal search warrant immediately after debriefing Francois. While the warrant affidavit included Agent Eustice's observation of Bechir's loading the boxes into his Mercedes, it did not include information learned by Agent Deslauriers' initial search of the vehicle. The evidence in the Mercedes therefore would have been inevitably discovered when the Agents later searched the vehicle pursuant to the search warrant.

For these reasons, the district court did not err in denying Bechir's suppression motion.

## V. KENNY'S SUFFICIENCY OF THE EVIDENCE ISSUES

On appeal, Kenny argues that his seven convictions should be vacated because there was insufficient evidence that he knowingly took part in the criminal activities of identity theft and tax fraud.[6] We address each conviction in turn.

---

[6] "We review de novo challenges to the sufficiency of the evidence to support a conviction, viewing the evidence and all reasonable inferences derived therefrom in the light most favorable to the government." United States v. Baldwin, 774 F.3d 711, 721 (11th Cir. 2014). To sustain a verdict of guilt, the evidence "need not exclude every reasonable hypothesis of innocence" or be "wholly inconsistent with every conclusion except that of guilt," as long as a "reasonable factfinder" choosing from among reasonable constructions of the evidence "could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Kelly, 888

27

### A.    Conspiracy to Possess Unauthorized Access Devices

As to Count 1, Kenny argues that the evidence was insufficient to convict him of conspiracy to possess 15 or more unauthorized access devices because there was no evidence that he took part in any criminal activity or knew about any of the processes by which he could obtain fraudulent tax refunds.

Section 1029(a)(3) makes it a crime for anyone to "knowingly and with intent to defraud possess[] fifteen or more devices which are counterfeit or unauthorized access devices." 18 U.S.C. § 1029(a)(3). Section 1029(b)(2), in turn, provides criminal liability for "[w]hoever is a party to a conspiracy of two or more persons to commit an offense under subsection (a) of this section, if any of the parties engages in any conduct in furtherance of such offense." Id. § 1029(b)(2). Social Security numbers and debit cards are "access devices." See Baldwin, 774 F.3d at 722; see also 18 U.S.C. § 1029(e)(1) (defining "access devices" to include "any card . . . [or] personal identification number . . . that can be used . . . to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds").

---

F.2d 732, 740 (11th Cir. 1989). "This standard of review applies to both direct and circumstantial evidence." United States v. Sepulveda, 115 F.3d 882, 888 (11th Cir. 1997).

28

To obtain a conviction for conspiracy, the government must prove "beyond a reasonable doubt, even if only by circumstantial evidence, that a conspiracy existed and that the defendant knowingly and voluntarily joined the conspiracy." United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005) (quotations omitted). "Although mere presence at the scene of a crime is insufficient to support a conspiracy conviction, presence nonetheless is a probative factor which the jury may consider in determining whether a defendant was a knowing and intentional participant in a criminal scheme." Id. (quotations omitted). "A conspiracy conviction will be upheld when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." United States v. Garcia, 447 F.3d 1327, 1338 (11th Cir. 2006) (quotation and alteration omitted); see also United States v. Brantley, 68 F.3d 1283, 1288 (11th Cir. 1995) (noting that the personal relationship and close proximity between a defendant and co-conspirator during the commission of an offense made it more likely that the defendant was aware of the illicit plan).

Construed in the light most favorable to the government, the trial evidence here permitted a reasonable jury to find Kenny guilty of the conspiracy charge beyond a reasonable doubt. For starters, the June 9, 2014, undercover investigation placed Kenny at the townhouse, along with Bechir and Francois.

29

Both the Agents and Bechir identified Kenny on the undercover video that Francois recorded. Notably, that video depicted Kenny right alongside laptops, documents listing PII, debit cards, a money counter, and a rifle—all out in the open. At one point, Kenny was holding a laptop power cord and papers. As observed earlier, the fraudulent tax returns were filed using computers and the papers containing PII had hundreds of names of real people with their dates of birth and Social Security numbers.

Moreover, Kenny's own statements on the undercover video demonstrated that he knew that the PII and debit cards were being used in the identity theft and tax fraud scheme. As Bechir confirmed at trial, it was Kenny who said: "[w]hen you work over and over, and you send everything at once, and you're done, that's better." Detective Sealy testified that, in this type of fraud, the term "work" meant using stolen PII to file a fraudulent tax return or to open a credit card account. On the video, Kenny also said that "I'm going to have these chicks buy me some plastic," and Detective Sealy testified that "plastic" in this context referred to debit or credit cards.

Also, after learning that the Agents were surveilling the townhouse, Kenny said he was leaving and going to a hotel where it would be safer to "work." According to Detective Sealy, criminals involved in "stolen identity refund fraud" often work out of hotels so that they can use the hotel's wi-fi, which makes it

30

harder for law enforcement to track their online activities.  Around this time, someone also told Kenny that he looked scared, and Bechir mentioned that someone might go to jail.  Moments later, Kenny was holding the laptop power cord and papers, and then he left the townhouse.

Not only was Kenny present in the townhouse on June 9, his personal belongings were found amidst the extensive evidence of fraud.  In the townhouse, the Agents found an IRS letter addressed to Kenny and receipts showing that Kenny had purchased the three firearms.  These items of Kenny's were found along with various documents containing PII, other documents listing Gustavo Cruz's EFIN, a boxful of prepaid debit cards, $29,000 in a safe, and money counters.  Then, in the garage, along with Kenny's Audi service contract and insurance records, Agents found other documents related to Gustavo Cruz, a record showing that a parcel was shipped to the IRS, and instructions for obtaining an EFIN.

In the three boxes Bechir moved from the townhouse to his Mercedes, the Agents found one of Kenny's bills comingled with several other documents listing PII and even more prepaid debit cards.  Importantly too, Kenny's fingerprints were found on one of the documents containing PII that was recovered from the Mercedes.  That document was a printed Excel spreadsheet that listed the names, dates of birth, and Social Security numbers of 32 different people.  And on that

specific spreadsheet, there were debit account numbers written next to certain individuals' PII, which indicated that their personal information was used to file fraudulent tax returns.

Furthermore, the IRS Analyst reviewed just six pages of these same type of Excel spreadsheets and determined that the debit account numbers written next to the PII entries were linked to 21 fraudulent tax returns that had been filed. Those fraudulent tax returns had requested a total of $186,697 in tax refunds. Of the requested refunds, the IRS directly deposited $51,441 in tax refunds to the listed debit accounts. In addition, those fraudulent tax returns were all filed in the two months preceding the June 9 investigation with Gustavo Cruz's EFIN—the same EFIN that the Agents found in the townhouse.

In sum, there was more than sufficient evidence for a reasonable jury to convict Kenny of the conspiracy charge in Count 1.

## B.    Possession of Unauthorized Access Devices

As to his Count 2 conviction, Kenny argues that the evidence was insufficient for the jury to find that he knowingly possessed 15 or more access devices. As stated above, § 1029(a)(3) makes it a crime for anyone to "knowingly and with intent to defraud possess[] fifteen or more devices which are counterfeit or unauthorized access devices." 18 U.S.C. § 1029(a)(3). "A person constructively possesses an item when he has knowledge of the thing possessed

32

coupled with the ability to maintain control over it or reduce it to his physical possession, even though he does not have actual personal dominion." Baldwin, 774 F.3d at 722 (quotations omitted). "Constructive possession also occurs when a person exercises ownership, dominion, or control over the contraband itself or dominion or control over the premises or the vehicle in which the contraband [is] concealed." Id. (quotations omitted).

The same evidence supporting the conspiracy to possess unauthorized access devices amply shows that Kenny was aware of and had the ability to control the PII and debit cards that were being used in the identity theft and tax fraud scheme. For instance, the video recording placed Kenny in the townhouse surrounded by the identity theft and tax fraud evidence and showed him talking about purchasing "plastic," among other things. Additionally, Kenny's personal items were mixed with the loose documents listing the PII, as well as the stacks of debit cards, in both the townhouse and Mercedes, and his fingerprints were found on a document containing PII. That page alone contained 32 individuals' names, dates of birth, and Social Security numbers and notations indicating that the personal information was used to file fraudulent tax returns. This evidence was sufficient for the jury to conclude that Kenny knowingly possessed the Social Security numbers and debit cards used in the identity theft and tax fraud scheme.

## C.    Aggravated Identity Theft

33

As to Counts 3-7, Kenny contends that his aggravated identity theft convictions, under 18 U.S.C. § 1028A(a)(1), should be vacated because there was insufficient evidence that he knew that the means of personal identification he possessed belonged to real people.[7]

Section 1028A(a)(1) provides for an additional two-year sentence for whoever "during and in relation to" certain felonies, including possession of 15 or more unauthorized access devices, "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person."  18 U.S.C. § 1028A(a)(1) (emphasis added).  The "means of identification" element refers to "a name, social security number, date of birth, or driver's license number, among other things."  United States v. Doe, 661 F.3d 550, 561 (11th Cir. 2011).

For aggravated identity theft convictions under § 1028A(a)(1), the government must prove "that the defendant knew that the means of identification at issue belonged to another person."  Flores-Figueroa v. United States, 556 U.S. 646, 657, 129 S. Ct. 1886, 1894 (2009).  That is, the defendant must know that he possessed "for example, a real ID belonging to another person rather than, say, a fake ID (i.e., a group of numbers that does not correspond to any real Social

_____

[7]To the extent that Kenny argues that his aggravated identity theft convictions were not supported by sufficient evidence that he had knowledge of the PII or identity theft in general, the same evidence supporting the knowledge element for his conspiracy to possess unauthorized access devices and possession of unauthorized access devices convictions establishes his knowledge of the PII for the aggravated identity theft convictions as well.

Security number)." Id. at 648, 129 S. Ct. at 1889. Therefore, to convict Kenny of the five aggravated identity theft counts, the government was required to show that Kenny knew the means of identification for L.C. (Count 3), J.F. (Count 4), C.L. (Count 5), D.S. (Count 6), and G.S. (Count 7), belonged to real people. See Baldwin, 774 F.3d at 723.

In United States v. Holmes, 595 F.3d 1255, 1258 (11th Cir. 2010), this Court established that the government can rely on circumstantial evidence about an offender's misuse of a victim's identity to prove the offender knew the identity belonged to a real person to support aggravated identity theft convictions under § 1028A(a)(1). We held that a reasonable jury could have found that the government had proved that the defendant knew that a Social Security card and birth certificate belonged to a real person when she used them to apply for a driver's license. Id. We explained that, because the defendant obtained a line of credit and successfully used the Social Security card and birth certificate to obtain a passport and two identification cards before she used the victim's identity in the charged offense, a reasonable trier of fact could have found the defendant knew the identity belonged to a real person. Id. We reasoned further that a reasonable jury could have found that "[the defendant] would not have sought credit using [the victim's] personal information if [the defendant] were not confident that [the victim] likely had an actual credit history." Id. Thus, "a defendant's repeated and

35

successful testing of the authenticity of a victim's identifying information prior to the crime at issue is powerful circumstantial evidence that the defendant knew the identifying information belonged to a real person as opposed to a fictitious one." Doe, 661 F.3d at 562-63.

This Court reaffirmed that principle in United States v. Gomez-Castro, 605 F.3d 1245, 1248–49 (11th Cir. 2010), holding that the defendant's purchase of the victim's birth certificate and Social Security card for $2,500 and repeated testing of the authenticity of both by successfully obtaining a driver's license, two credit cards, and a bank account, was sufficient to show that the defendant knew the birth certificate and Social Security card belonged to a real person for his aggravated identity theft conviction under § 1028A(a)(1).  We explained that "[b]oth the circumstances in which an offender obtained a victim's identity and the offender's later misuse of that identity can shed light on the offender's knowledge about that identity."  Id. at 1248.

In Baldwin, an identity theft and tax fraud case like this one, this Court held that a reasonable jury could consider that a victim's information was "used as part of a scheme to obtain a refund from the IRS, which verifies the name and Social Security number of the person requesting the refund, in considering whether [the defendant] knew that [the victim] was a real person" for the aggravated identity theft convictions under § 1028A(a)(1).  Baldwin, 774 F.3d at 723–26.  We also

36

said that a jury could consider the origin of the personal information being used. Id. at 723. There, the information was found on a document from the Florida Agency for Persons with Disabilities, and the jury could infer that the state agency did not keep records that did not relate to real people. Id.

Under this precedent, a reasonable jury could have found, beyond a reasonable doubt, that Kenny knew the five victims' personal information belonged to real people because the Delvas were using the information "as part of [their] scheme to obtain a refund from the IRS, which verifies the name and Social Security number of the person requesting the refund." Id. at 723–26. And the Delvas' identity theft and tax fraud scheme was working.

Indeed, the five victims' names, dates of birth, and Social Security numbers were found listed on spreadsheets in one of the boxes that Bechir moved from the townhouse to his car. Kenny's fingerprints were on one of the spreadsheet documents, along with notations indicating that the personal information was used to file fraudulent tax returns. The evidence indicated that the Delvas either already had used or planned to use the names, dates of birth, and Social Security numbers contained in these same spreadsheets to request fraudulent tax refunds from the IRS. In six pages worth of spreadsheets alone, the Delvas already had used 21 identities to file fraudulent tax returns. The fraud scheme clearly worked because the IRS paid out $51,441 in refunds in connection with those fraudulent tax

37

returns. To be sure, "[u]sing stolen identities was the central feature of the scheme." See United States v. Sammour, 816 F.3d 1328, 1337 (11th Cir. 2016) (holding that evidence was sufficient to find identifications belonged to real people to support convictions of aggravated identity theft where, inter alia, a defendant had sophisticated knowledge of stolen identity refund scheme and was sure that checks from the IRS were valid). A reasonable jury could have found that Kenny would not have sought a refund from the IRS with the personal information he possessed, including the five victims' information, unless he thought that the victims were real people with real Social Security numbers. See Holmes, 595 F.3d at 1258.

Further, from the sheer volume of PII listed on the documents seized in this case, the jury could infer that the Delvas expected their ongoing tax-fraud scheme to continue working for some time. The Delvas possessed nearly 1,700 names with Social Security numbers, and all but 16 of those belonged to real people. Even after learning that law enforcement was surveilling them, Kenny planned to relocate the operations and continue "working" out of a hotel. Viewing this evidence in the light most favorable to the government, the jury could infer that the identity theft and tax fraud scheme was working and that Kenny knew that all of

38

the names, dates of birth, and Social Security numbers listed in those spreadsheets, including those of the five named victims, belonged to real people.[8]

## VI.  THE EXPERT OPINION ISSUE

Together, the Delvas next argue that the district court abused its discretion in permitting Detective Sealy to testify as an expert in identity theft and tax fraud and the terminology and jargon used in this type of crime.  Specifically, their objections relate to Sealy's opinion interpreting what he saw on the undercover video and to his testimony on terminology.[9]

### A.    Detective Sealy's Expert Testimony

In determining the admissibility of expert testimony under Federal Rule of Evidence 702, a district court must consider whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as

---

[8]In this particular Section V(C), we have focused on Counts 3 through 7.  But as to Counts 1 and 2, to the extent Kenny also argues the government failed to prove he knew the PII belonged to real people, that claim fails because knowledge that the PII belonged to real people is not a requirement of his convictions under § 1029(b)(2) in Count 1 and § 1029(a)(3) in Count 2.  18 U.S.C. § 1029(a)(3), (b)(2).  In any event, the evidence in this case was sufficient to show Kenny knew the PII belonged to real people with regard to Counts 1 and 2 as well.

[9]We note that, while Kenny objected at trial to the admission of Detective Sealy's expert testimony, Bechir did not and thus our review is for plain error.  However, because we conclude that the Delvas have not shown any error, much less plain error, we need not undertake a separate plain error analysis here.

39

determined by the sort of inquiry mandated in <u>Daubert</u>;[10] and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." <u>United States v. Holt</u>, 777 F.3d 1234, 1265 (11th Cir. 2015).[11]

It is well-settled that experienced and qualified law enforcement agents can testify as experts to decode criminal conversations and operations that jurors might not otherwise understand.  <u>See, e.g.</u>, <u>Holt</u>, 777 F.3d at 1265 (holding the district court did not err in permitting an agent to "testify as to the meanings of coded language used by the defendants in intercepted communications" relating to their narcotics charges because of agent's extensive involvement in this investigation and her training and experience in previous wiretaps); <u>United States v. Emmanuel</u>, 565 F.3d 1324, 1335 (11th Cir. 2009) ("The operations of narcotics dealers, including drug codes and jargon, are proper subjects of expert testimony"); <u>Garcia</u>, 447 F.3d at 1335 (recognizing well-established rule that an experienced narcotics agent may testify as an expert to interpret drug codes and terminology to help a jury understand the significance of operations unique to the drug distribution

---

[10]<u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993).

[11]We review a district court's decision to admit expert testimony for an abuse of discretion.  <u>United States v. Brown</u>, 415 F.3d 1257, 1264–65 (11th Cir. 2005).  We will not reverse a district court's evidentiary ruling in the absence of manifest error.  <u>Holt</u>, 777 F.3d at 1264.  As we have explained, "a district court enjoys considerable leeway" in making its evidentiary rulings.  <u>United States v. Frazier</u>, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc).

business); United States v. Cross, 928 F.2d 1030, 1051 n.65 (11th Cir. 1991)

(noting that it was proper for an FBI agent to testify that, in communicating with

one another, pedophiles use certain code words to refer to photographs of

children); United States v. Brown, 872 F.2d 385, 392 (11th Cir. 1989) (determining

that the district court did not err in allowing FBI agent to testify as to drug code

words); United States v. Masson, 582 F.2d 961, 963–64 (5th Cir. 1978) (finding no

error where FBI agent with extensive experience and knowledge of bookmaking

operations and terminology gave expert testimony interpreting gambling jargon to

aid the jury's understanding of recorded conversations); United States v. Alfonso,

552 F.2d 605, 618 (5th Cir. 1977) (upholding use of expert testimony to supply

meaning to the "cryptic nature of [some] recorded conversations, often framed in

jargon peculiar to the gambling trade" because "it was appropriate to present

expert testimony to supply meaning to the conversations and explain the roles of

the appellants").

"[F]ederal courts have ordinarily allowed law enforcement officials to testify

as experts . . . to establish the modus operandi of particular crimes, in order to

explain the actions of the defendants." Cross, 928 F.2d at 1050 (quotations

omitted); see also United States v. Burchfield, 719 F.2d 356, 358 (11th Cir. 1983)

(concluding that an agent's testimony regarding counterfeit-bill-passing techniques

helped to elucidate the actions of the defendants).

41

Here, the district court did not abuse its discretion in allowing Detective Sealy to testify as an expert witness as to the meanings of the terminology used in stolen identity refund fraud generally or by the individuals recorded on the undercover video specifically.  First, Detective Sealy was qualified to testify competently regarding the terminology used in this type of fraud based on his training and experience.  Detective Sealy received extensive training on identity theft crimes from the IRS, U.S. Secret Service, Citibank, Homeland Security, Discover Card, Broward Community College, and the Broward College Police Academy.  His IRS training specifically focused on the ways in which stolen identities are used to fraudulently request tax refunds and how to investigate those crimes.

As to his experience, Detective Sealy had personally participated in more than 75 fraud-related investigations, sometimes in an undercover capacity, with 50 of those investigations involving tax fraud.  He had listened in on over 30 jail calls placed by defendants charged with stolen identity refund fraud and debriefed over 20 such cooperating defendants.  Detective Sealy had even taught classes on fraud-related topics, as well as previously testified in a case in federal court as an expert in fraud investigations and terminology.  Detective Sealy clearly was an experienced agent with specific and substantial exposure to "stolen identity refund fraud."  See Garcia, 447 F.3d at 1334–35 (finding agent to be properly qualified as

42

an expert because he "had been a DEA agent for several years and had received training regarding the operation and structure of drug trafficking organizations and how those organizations transport and distribute drugs," as well as personally participating in at least 50 drug investigations and numerous wiretap investigations, which made him familiar with the coded language that some drug trafficking organizations use); Holt, 777 F.3d at 1265 ("Agent Sargent was qualified based on, most notably, her extensive involvement in this particular investigation, including review of more than 99 percent of the intercepted communications in this case, as well as her training, experience in previous wiretaps, and general investigative experience during her six years as a DEA Agent.").

Second, Detective Sealy's methodology was reliable because his opinions were based on his extensive experience working on stolen identity refund fraud cases, including investigating them, working undercover, listening in on numerous jail calls, and debriefing defendants charged with this crime. Based on these investigations, Detective Sealy was familiar with the methods by which stolen identity refund fraud is conducted and the terminology used in this type of fraud. Of the 50 tax fraud cases Detective Sealy investigated, the majority involved criminals using coded terminology.

Third, Detective Sealy's testimony assisted the jury in understanding how the slang terms used by Bechir and Kenny related to the terminology used in this stolen identity refund fraud. For example, in his post-Miranda interview, Bechir admitted to finding the "fos" online and using it to file fraudulent tax returns. Detective Sealy competently testified that, in South Florida, "fos" is a common slang term used in "stolen identity refund fraud" and means personal identifying information or PII, such as an individual's name, date of birth, and Social Security number. On the undercover video recording, when Kenny said that he was going to "have these chicks buy me some plastic," Detective Sealy explained to the jury that "plastic" refers to debit cards or credit cards. This scheme involved having the tax refunds deposited in debit card accounts that were opened using the same PII that was used to file corresponding fraudulent tax returns. While a lay person might be able to guess the meanings of the code words or terminology used by Bechir and Kenny, Detective Sealy "could—based on [his] training and experience—interpret the meaning of the words more accurately than a lay person or the prosecutor." See Holt, 777 F.3d at 1266.

To the extent that the Delvas contend that allowing Detective Sealy to testify as an expert permitted him to invade the province of the jury and give his opinion on their ultimate guilt, we find no support for that contention in the record. Detective Sealy's testimony was focused on describing stolen identity tax refund

44

fraud generally and explaining the meanings of particular words used on the video recording. The record does not show that Detective Sealy offered overall opinions as to Bechir's or Kenny's guilt. The district court did not err, much less manifestly err, in admitting Detective Sealy's testimony.

## VII.  CUMULATIVE ERROR

The Delvas' last argument concerning their convictions is that cumulative error by the district court requires reversal. Bechir and Kenny have not established a single error, let alone the aggregation of "many errors" that may require a reversal where the individual errors do not. See United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005), abrogated on other grounds by Davis v. Washington, 547 U.S. 813, 821, 126 S. Ct. 2266, 2273 (2006). The Delvas' cumulative error claim therefore lacks merit.

## VIII.  SENTENCING ISSUES

Both Delvas raise sentencing issues. After the guilty verdicts, a probation officer prepared presentence investigation reports ("PSI") for the Delvas.

### A.    Bechir's Sentencing

Bechir's PSI applied a base offense level of 6 under U.S.S.G. § 2B1.1(a)(2) because he was convicted of a fraud crime with less than a 20-year statutory maximum term of imprisonment. The PSI increased Bechir's offense level to 26 based on: (1) a 14-level increase under § 2B1.1(b)(1)(H) because the loss amount

was $1,014,697; (2) a 2-level increase under § 2B1.1(b)(2)(A)(i) because the offense involved more than 10 victims; (3) a 2-level increase under § 3C1.1 because Bechir willfully obstructed justice by falsely testifying at trial; and (4) a 2-level increase under § 2B1.1(b)(15)(B) because the offense involved possession of a firearm in connection with the offense.

Bechir's total offense level of 26 and criminal history category of I yielded an advisory guidelines range of 63 to 78 months' imprisonment for Counts 1 and 2. As to Counts 3-7, Bechir was subject to a mandatory 24-month prison term, which was required to be served consecutive to any other sentence imposed for Counts 1 and 2, but that could be imposed concurrently with each other. See 18 U.S.C. § 1028A(a)(1), (b)(2), and (b)(4).

Bechir's only objection to his guidelines range calculation was to the application of the firearm enhancement. At the sentencing hearing, Bechir argued that, although he had admitted that the firearms were in the townhouse for protection against getting robbed, the firearm enhancement was improper because the weapons were not used in any way.

The district court overruled this objection to the firearm enhancement, finding that "[t]he gun was clearly there as a means of enforcement or protection to protect the fraud factory that was going on there." The district court found further

46

that possessing the gun was "inherent to the fraud crime that was going on and a part of it."

The district court stated that it had considered the Sentencing Guidelines, the 18 U.S.C. § 3553(a) factors, and Bechir's personal characteristics, among other things. Highlighting the need for deterrence, the district court found it appropriate to impose a sentence that could prevent others who would be "tempted to make a quick, easy buck and swindle the government out of thousands, if not hundreds of thousands of dollars."

The district court sentenced Bechir to imprisonment of: (1) 60 months on Count 1 (the conspiracy); (2) 78 months on Count 2 (the possession of unauthorized access devices) to run concurrent with Count 1; and (3) 24 months on each of Counts 3-7 (the aggravated identity thefts) to run concurrent with each other, but consecutive to Counts 1 and 2.

## B.    Kenny's Sentencing

The PSI's calculation of Kenny's advisory guidelines range was largely identical to Bechir's, except that Kenny did not receive the 2-level obstruction of justice increase under § 3C1.1. Kenny's total offense level of 24 and criminal history category of I yielded an advisory guidelines imprisonment range of 51 to 63 months' imprisonment for Counts 1 and 2. As to Counts 3-7, Kenny was subject to a mandatory 24-month prison term, which was required to be served

consecutive to any other sentence imposed for Counts 1 and 2, but that could be imposed concurrently with each other. See 18 U.S.C. § 1028A(a)(1), (b)(2), and (b)(4).

As with Bechir, Kenny objected to the firearm enhancement. Kenny argued that, even though Bechir said that Kenny bought the firearms and Bechir kept them "for protection from robbery," there was no evidence that Kenny: (1) was aware that Bechir was using the firearms for protection; (2) had possession or control of the firearms after giving them to Bechir; or (3) had any intent or plan to use the firearms for protection. At the sentencing hearing, Kenny acknowledged the strength of Bechir's admissions that the firearms were used for protection in the fraud scheme, but argued nevertheless that there was no evidence linking Kenny to the use of those firearms other than the fact that he bought them for his brother Bechir.

The district court overruled this objection, finding that "the rifle was there in open view for easy access, so that the people who were involved in the fraud factory could grab it real quick and defend themselves . . . if someone was going to try to rip them off." The district court found further that everyone who was in the room with the rifle and participating in the fraudulent tax return scheme was in constructive possession of the firearm, and it was reasonably foreseeable to all of them that the gun was there to protect "the fraud factory."

48

After considering the Sentencing Guidelines and the § 3553(a) factors, the district court sentenced Kenny to imprisonment of: (1) 60 months on each of Counts 1 and 2 to run concurrent to each other; and (2) 24 months on Counts 3-7, to run concurrent with each other, but consecutive to Counts 1 and 2.

## C.    Firearm Enhancement

On appeal, both Bechir and Kenny argue that, in calculating their advisory guidelines ranges for Counts 1 and 2, the district court erred in applying the 2-level enhancement under § 2B1.1(b)(15)(B) for possession of a firearm in connection with their offenses. Individually, Bechir contends that the district court erred in applying the enhancement because his post-Miranda written statement was insufficient to trigger the firearm enhancement, and there was no other evidence that he intended to use the firearm for protection. Kenny argues that the district court erred when it found he was in constructive possession of the firearm found in the townhouse because there was no evidence that he possessed the firearm, knew that Bechir was using the firearm for protection, or was aware of the money in the safe.

In reviewing the procedural reasonableness of a sentence, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based

49

on clearly erroneous facts, or failing to adequately explain the chosen sentence." United States v. Barrington, 648 F.3d 1178, 1194 (11th Cir. 2011) (quotations omitted).  When a defendant challenges the application of a sentencing enhancement, we review a district court's factual findings on the disputed sentencing enhancement only for clear error and its application of the Sentencing Guidelines to those facts de novo.  United States v. Matos-Rodriguez, 188 F.3d 1300, 1309 (11th Cir. 1999).  Under clear error review, we will not disturb the district court's findings unless we are left with a definite and firm conviction that a mistake was made.  United States v. Monzo, 852 F.3d 1343, 1345 (11th Cir. 2017).

The Sentencing Guidelines provide for a two-level offense increase if a defendant possessed a dangerous weapon, such as a firearm, in connection with his fraud offense of conviction.  U.S.S.G. § 2B1.1(b)(15)(B) (2016).  The mere possession of a firearm during the commission of an offense can, in certain circumstances, be sufficient to apply a sentencing enhancement.  United States v. Jackson, 276 F.3d 1231, 1234 (11th Cir. 2001) (holding that a firearm sentencing enhancement for mere possession is proper "where it is reasonable to assume that a defendant possesses a firearm, even without using it, to prevent the theft of counterfeit currency in his possession").  We look at the circumstances surrounding the offense and firearm possession to determine whether it is reasonable to infer that the firearm might be used during an offense.  See United

50

States v. McClain, 252 F.3d 1279, 1288 (11th Cir. 2001).  A co-conspirator's possession of a firearm may be attributed to the defendant if the co-conspirator's possession of the firearm was reasonably foreseeable by the defendant, occurred while the defendant was a member of the conspiracy, and was in furtherance of the conspiracy.  United States v. Villarreal, 613 F.3d 1344, 1359 (11th Cir. 2010).

In this case, the district court did not err in applying the firearm enhancement or clearly err in finding that Bechir and Kenny had possessed a firearm in connection with their offenses.  Bechir and Kenny were conducting substantial identity theft and tax fraud operations out of the townhouse.  Not only did they have scores of PII and debit cards there, they also kept the proceeds from their fraud in the townhouse—$29,000 in a safe.  Amidst all the fraud-related materials and money, the Delvas had a rifle that Kenny had purchased leaning up against the wall in the exact same room and at the exact same time as they were conducting their various fraudulent activities.

More still, Bechir expressly admitted in his post-Miranda statement that the firearms were kept in the townhouse to protect them from being robbed.  Although Bechir testified at trial that the Agents coerced his statement and the firearms were actually kept for recreational purposes, the district court was free to reject that testimony and conclude instead that the gun was in the townhouse to protect the fraud operations.

51

And while Kenny now disclaims any knowledge of the purpose of the firearm or the money in the safe, the trial evidence indicated otherwise. Kenny was the registered owner of the firearms found in the townhouse and a knowing participant in the identity theft and tax fraud scheme. Even though Bechir said that he kept the guns for protection, possession of the firearms could be properly attributed to Kenny too because it was reasonably foreseeable that Bechir would possess a firearm in furtherance of the fraud in any event. See Villarreal, 613 F.3d at 1359. Indeed, Kenny purchased the firearms for Bechir.

Based on this record, the district court did not clearly err in finding that the rifle was in the townhouse as a means of protection against potential robberies and, thus, both Delvas possessed the firearm in connection with their offenses. See Matos-Rodriguez, 188 F.3d at 1309 (holding that a defendant who "possessed [a] pistol to prevent theft [of counterfeit money] during a close, face-to-face, hand-to-hand encounter with a person he apparently did not know well" possessed a firearm "in connection with" the offense). Therefore, the 2-level increase pursuant to § 2B1.1(b)(15)(B) was properly applied to Bechir's and Kenny's sentences.

**D.    Substantive Reasonableness**

Kenny asserts that his total 84-month sentence was substantively unreasonable because the nature and circumstances of his offenses, the need to

reflect the serious of the offenses, and the need to protect the public, all support a lesser sentence.

We review the reasonableness of a sentence under the deferential abuse-of-discretion standard. Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007). "The party challenging the sentence bears the burden to show that the sentence imposed is unreasonable in light of the record and the 18 U.S.C. § 3553(a) factors." United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010).

The district court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes listed in 18 U.S.C. § 3553(a)(2), including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public. See 18 U.S.C. § 3553(a)(2). The district court must also consider, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable advisory guidelines range, the pertinent policy statements of the Sentencing Commission, and the need to provide restitution to victims. 18 U.S.C. § 3553(a)(1), (3)-(7).

We have made clear, though, that the weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court. United States v. Croteau, 819 F.3d 1293, 1310 (11th Cir. 2016). We will not remand for

resentencing unless we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Id. (citing United States v. Irey, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc)). And while we do not presume that a sentence falling within the guidelines range is reasonable, we ordinarily expect it to be so. United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008). "A sentence imposed well below the statutory maximum penalty is another indicator of reasonableness." Croteau, 819 F.3d at 1310."

Kenny has not demonstrated that his 84-month sentence was substantively unreasonable. In fashioning Kenny's sentence, the district court considered the Sentencing Guidelines and the § 3553(a) factors and imposed a total within-guidelines sentence of 60 months' imprisonment followed by the mandatory consecutive 24-month sentence for his five aggravated identity theft convictions. We normally expect a sentence falling within the guidelines range to be reasonable. See Hunt, 526 F.3d at 746. The district court also ordered that Kenny's five mandatory 24-month aggravated identity theft sentences run concurrently with each other, not consecutively to each other, which resulted in a significantly shorter total sentence. Although the district court emphasized the need to deter others from engaging in this type of fraud when it imposed Kenny's

54

sentence, the district court did not abuse its discretion in doing so.  Finally, Kenny's total 84-month sentence was well below the 25-year statutory maximum for all of the charged crimes combined, another indicator of reasonableness.  See Croteau, 819 F.3d at 1310.

## IX.  CONCLUSION

For the reasons stated above, we affirm Bechir Delva's and Kenny Delva's convictions and sentences.

**AFFIRMED.**